**Francis SWEANY, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 36S00–9109–CR–674.

Supreme Court of Indiana.

Feb. 8, 1993.

Susan K. Carpenter, Public Defender, David P. Freund, Deputy Public Defender, for appellant.

Pamela Carter, Atty. Gen., Lisa M. Paunicka, Deputy Atty. Gen., Indianapolis, for appellee.

SHEPARD, Chief Justice.

At the conclusion of a jury trial Francis "Bo" Sweany was convicted of murdering

his wife by stabbing her several times in the heart.[1] The trial court sentenced him to the maximum term of sixty years, Ind. Code Ann. § 35–50–2–3(a) (West Supp. 1992), a sentence which affords him appeal direct to this Court. Ind.Appellate Rule 4(A)(7).

Sweany challenges the trial court's refusal to read a requested jury instruction, the sufficiency of the evidence, and the length of his sentence. We affirm.

### Facts

By all accounts, the marriage of Bo and Cecelia "Cil" Sweany was a difficult one. It was punctuated by frequent violent confrontations, one of which landed Cil in the hospital in 1986 and led to battery charges being filed against Bo.[2] The evidence in the trial of this case showed that Bo continued to be abusive over the next four years. On May 16, 1990, Cil told Bo that she wanted a divorce. Bo replied he would kill her before she got a divorce.

The evidence further showed that Bo was convinced Cil was having an affair with another man. In the presence of Cil's mother, Bo jerked a telephone out of a wall and told Cil he would "blow her away" if he saw her with another man. Cil's response was to take an overdose of sleeping pills, which led to her being hospitalized again. While in the hospital, Cil told her doctor that although she could no longer stand Bo's abuse, she did not really want to commit suicide.

Cil took refuge at a shelter for battered women in Columbus. She remained there for approximately two weeks before returning to Jackson County. She stayed at her parents' trailer. It stood a few hundred feet from her home, where Bo continued to reside. Bo and Cil began talking again. On Friday, June 1, 1990, they went to a drive-in movie with their thirteen-year-old son, B.J. The next night, Bo and Cil drove to Nashville, Indiana, to see a country music show. The show was sold out, so the two had dinner at a Nashville restaurant instead. Later that night, after Bo and Cil returned to Jackson County, Cil bled to death in the doorway of their house. The evidence showed that no one other than Bo and Cil were in the house at the time.

Bo's explanation of the events leading to Cil's death pointed toward suicide. Bo testified that after he and Cil talked a while, he refused her request for sex and Cil became upset. He said he then went outside for five or ten minutes to check on storm damage. When he returned, he found Cil on the floor with a knife in her chest.

Bo had told relatives about the "suicide" on the night of Cil's death. Leon Ross, the victim's brother, lived with his wife Charlotte about a half-mile from Bo and Cil. He testified that on the night of the murder Bo drove up to his house and told him, "She did it again." When Leon asked "What?", Bo said, "She stabbed herself." Leon and Bo rushed back to the Sweany house in Bo's truck, with Leon driving. Charlotte followed behind in a car. Leon pulled up to the house, the truck's headlights illuminating the front door. He saw Cil on the floor in the doorway, bleeding profusely. Her blouse had been ripped open. Leon asked Bo to help him carry Cil to the truck, but Bo replied, "I can't." He paced the area, repeating, "Baby, look what you have done, why did you do this, how could you do this to yourself."

Leon and Charlotte carried Cil to the truck. Leon pulled Bo in and sped off for the hospital in Seymour. A Seymour police officer pulled the truck over for speeding, but soon provided an escort to the hospital. Upon arrival, the officer saw Bo get out of the truck and fall to his knees. When the officer approached, Bo repeatedly mumbled, "I don't know where the knife came from." An emergency medical technician on the scene also spoke to Bo. Among the things she heard him say was, "I am sorry, I didn't mean to."

1. Ind.Code Ann. § 35–42–1–1 (West Supp.1992).

2. The couple reconciled and the case was dismissed.

At trial, the State presented medical experts who testified it was extremely improbable that Cil Sweany could have stabbed herself in the heart ten times. Bo testified that she did it to herself. The jury did not believe him.

## I. Jury Instruction

■■■■ Appellant urges that the trial court committed reversible error when it refused to read the following tendered instruction to the jury:

The Defendant testified in the (Defense's) case during the trial. You will recall that it was brought out that before this trial he or she made statements which were the same as, or similar to, what he or she said in the courtroom. These earlier statements were brought to your attention to help you decide whether you believe The Defendant's testimony. If The Defendant said essentially the same thing on more than one occasion, it may be reason for you to believe The Defendant's testimony.

Record at 238.

Both parties agree that in reviewing a trial court's refusal of a tendered instruction, an appellate court asks three questions: (1) Is the tendered instruction a correct statement of law?; (2) Is there evidence to support giving the instruction?; and (3) Is the substance of the tendered instruction covered by other instructions given? *Chandler v. State* (1991), Ind., 581 N.E.2d 1233. Appellant's tendered instruction fails part three of the test, for it addresses the issue of credibility already covered in the court's final instructions. The court gave the pattern instruction on judging credibility. It adequately covered the subject:

You are the exclusive judges of the evidence, the credibility of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his or her ability and opportunity to observe; the manner and conduct of the witness while testifying; any interest, bias or prejudice the witness may have; any relationship with other witnesses or interested parties; and the reasonableness of the testimony of the witness considered in the light of all the evidence in the case.

You should attempt to fit the evidence to the presumption that the defendant is innocent and the theory that every witness is telling the truth. You should not disregard the testimony of any witness without a reason and without careful consideration. If you find conflicting testimony you must determine which of the witnesses you will believe and which of them you will disbelieve.

In weighing the testimony to determine what or whom you will believe, you should use your own knowledge, experience and common sense gained from day to day living. The number of witnesses who testify to a particular fact, or the quantity of evidence on a particular point need not control your determination of the truth. You should give the greatest weight to that evidence which convinces you most strongly of its truthfulness.

Record at 246. Moreover, this Court "has repeatedly held that instructions as to credibility of witnesses should not comment upon the weight to be given to the testimony of any particular witness." *Collins v. State* (1983), Ind., 453 N.E.2d 980, 982. Instructions concerning credibility must be general in nature and should not single out any particular witness for closer scrutiny. *Joy v. State* (1984), Ind.App., 460 N.E.2d 551. This is essentially what Sweany asked the trial court to do.

Appellant argues that the tendered instruction would not have "intimated" an opinion from the bench regarding Sweany's credibility. He says it would have "merely instructed" the jury that it could consider prior consistent statements in assessing defendant's credibility. We see a distinction without a difference. Defense counsel sought to add luster to his theory of the case by enlisting the imprimatur of the court in the form of a final instruction, which he could then invoke before the jury as yet another reason why his client should be believed. The trial court properly remained above the fray, leaving the argument to the lawyers.

## II. Sufficiency of the Evidence

Sweany's sufficiency challenge on appeal is consistent with his defense at trial—that there was reasonable doubt because of the possibility that Cil's wounds were self-inflicted. The thrust of this argument is directed at the State's experts, doctors McDonald and Whitler. McDonald was the attending physician in the emergency room who pronounced Cil Sweany dead. Whitler was a pathologist who offered his expert opinion that while "nothing is impossible," suicide was not a reasonable explanation. In his opinion, Cil would have been so weakened by the initial penetration of the knife that it is not reasonable to contemplate her continuing to thrust a knife through her chest, cartilage and ribs and into her heart.

McDonald supported Whitler's testimony, saying that a person could not penetrate her own heart more than once due to the excruciating amount of pain such a wound would cause. McDonald also described a gaping wound, indicative of numerous thrusts and twists of the knife. The prosecutor asked McDonald to describe the amount of force needed to cause such injuries. McDonald replied by characterizing it as a "great deal of force," adding that it would knock the wind out of a person punched that hard.

Whitler described the victim's wounds in greater detail. The depth of the wound was four-and-three-quarters inches. One cut followed an "L"-shaped path, crossing through the fifth rib and cutting part of the fourth. There were multiple penetrations to the sac around the heart, and ten lacerations to the heart itself. Two stabs went through both the front chamber of the heart and the chamber that separates the two lower chambers of the heart. There were five large incisions through the anterior wall of the heart. Of the ten lacerations to the heart, all but one pierced at least one wall.

Sweany posits that the doctors' opinions should be accorded little probative force because, in his estimation, they are based on a "hypothesis" that only a wound which pierced multiple chambers of the heart would have incapacitated Cil. This hypothesis, Sweany argues, is without foundation, because there was an eight-in-ten chance that the first wound was not one of the two that went through two chambers. The record does not confirm that the doctors' expert opinions were based on such a hypothesis. Even if it were so, "we will affirm the conviction if, considering only the probative evidence and reasonable inferences supporting the verdict, without weighing evidence or assessing witness credibility, a reasonable trier of fact could conclude that the defendant was guilty beyond a reasonable doubt." *Menefee v. State* (1987), Ind., 514 N.E.2d 1057, 1058. The expert testimony that Cil Sweany did not kill herself, together with the defendant's violent behavior toward his wife before the crime, his incredible version of events, and his statement to the medical technician that he was sorry and he "didn't mean to" was enough to enable a reasonable trier of fact to conclude that Bo Sweany was guilty beyond a reasonable doubt.

## III. Length of Sentence

Sweany contends that his sixty-year sentence is manifestly unreasonable and that a reasonable sentence would be the presumptive term of forty years. *See* Ind.Code Ann. § 35–50–2–3(a) (West Supp.1992).

In sentencing Sweany to the maximum term allowable under the statute, the trial court found there were no mitigating circumstances, and set forth the following aggravating circumstances:

(1) Defendant has a past history of criminal and delinquent activity;

(2) Defendant is in need of correctional or rehabilitative treatment that can best be provided by commitment to a penal facility;

(3) Imposition of a reduced sentence would depreciate the seriousness of the crime.

The Court further finds, as aggravating circumstances, that as of this date, the defendant has shown no or little remorse or regret for his terrible act, and just as importantly, no grief over the death of his wife. The nature of the

crime and the brutal manner in which it was committed, amounted to a cold blooded execution of the victim.

Record at 305–06, 308.

Sweany argues that these are not adequate reasons for adding twenty years to the presumptive term. He describes each as mere verbatim recitals of the aggravating circumstances to be considered according to Ind.Code Ann. § 35–38–1–7.1 (West Supp.1992), devoid of facts or explanation which support the court's conclusions. Moreover, Sweany argues that the second factor cited by the trial court—that he is in need of correctional treatment best provided by incarceration—does not support an aggravated sentence, because the trial court did not explain why the presumptive sentence would not adequately provide the needed rehabilitation. He also disputes the court's use of lack of remorse and/or grief, and the brutality of the crime as aggravating factors. How can one murder be any more brutal than another?, he asks. After all, he says, the victim probably did not feel anything after the first couple plunges of the knife.

 This is a metaphysical conundrum we need not address, for the rule is that a single aggravating factor may support an enhanced sentence. *Wills v. State* (1991), Ind., 578 N.E.2d 363. Further, we have stated that an enhanced sentence can be imposed even when the only aggravating circumstance is a prior criminal history. *Id.* at 365. Sweany's pre-sentence report revealed he was involved in criminal activity as a juvenile. The court also heard testimony throughout the trial regarding Sweany's behavior toward his wife which could fairly be characterized as criminal. We also reiterated recently in *Bellmore v. State* (1992), Ind., 602 N.E.2d 111, 129, that "while 'lack of remorse' is not expressly included in the list of aggravators for non-capital felony sentence enhancement, it has been recognized as a proper factor to be considered in imposing such sentences."

We would have preferred a more particularized articulation of the reasons for imposing the maximum sentence. *See Fry v. State* (1988), Ind., 521 N.E.2d 1302, 1306 (statement of reasons for selecting sentence should contain specific facts which lead court to find existence of each aggravator). Still, we cannot say in light of the evidence, the nature of the crime and the defendant's violent history that the sentence was manifestly unreasonable.

The trial court is affirmed.

DeBRULER, GIVAN, DICKSON and KRAHULIK, JJ., concur.