WILLIAMS, Darnell, Petitioner,

v.

STATE of Indiana, Respondent.

No. 45S00–0306–SD–248.

Supreme Court of Indiana.

June 27, 2003.

### ORDER CONCERNING SUCCESSIVE PETITION FOR POST–CONVICTION RELIEF IN CAPITAL CASE

#### Introduction

Darnell Williams asks leave to litigate a successive post-conviction claim, in which he requests that DNA testing be performed on certain blood evidence. With the scientific advancement of DNA testing,

courts are now able to receive important evidence not previously available. Williams, whose trial occurred before the widespread use of DNA evidence, seeks DNA testing to determine whether the blood spots on the shorts he was wearing when he was arrested and blood on the clothing of cohort Edwin Taylor was the blood of the victims. In some circumstances, DNA testing provides important information relating to a convicted person's guilt or innocence, or the appropriateness of a sentence. As explained more fully below, however, this is not one of those cases.

The evidence to be tested is not evidence that would reveal the DNA of the guilty person and confirm or negate the guilt of Williams. Rather, it is blood found on clothing of Williams and Taylor that the prosecution suggested came from the victims. Williams hopes the DNA tests will indicate that the blood on his shorts came from someone other than the two murder victims. If the tests were to reach that conclusion, he claims such results would be "exculpatory," and he would be entitled at least to reconsideration of his death sentence. Williams, however, was convicted of two murders in the course of a robbery, and his guilt was established at trial by an overwhelming body of evidence independent of the blood samples Williams seeks to test. We agree with the federal courts, which have also examined the significance of the blood evidence, and conclude that the death sentence is appropriate. Even if testing established the blood to be from someone other than the victims, the other evidence of guilt stands unrefuted and blood from another source is consistent with the conviction and death penalty in this case.

Because we conclude that Williams has not made a sufficient showing that even a favorable DNA test result would require reconsideration of his death sentence, we deny his request to seek successive post-conviction relief. In a separate order, we set August 1, 2003, as the date for execution of the death sentence.

### Procedural background of this case

Petitioner, Darnell Williams, by counsel, has filed a "Tender of Successive Petition for Post–Conviction Relief Requesting Forensic Testing Pursuant to I.C. 35–38–7(1)–(19)" and has tendered a "Motion For Forensic Testing ...." Respondent, the State of Indiana, was permitted to file "State's Response in Opposition to Tender of Successive Petition For Post–Conviction Relief." Williams tendered a "Reply to State's Response In Opposition to Tender of Successive Petition For Post–Conviction Relief" and "Submission of Habeas Exhibits." In addition, amici substantively aligned with Williams were allowed to file "Amicus Curiae Brief of A Group Of Concerned Attorneys And Law Professors In Support Of Motion For Forensic Testing Pursuant To Indiana Code § 35–38–7–1." The State has also filed a "Motion to Set Execution Date," which is the subject of a separate order entered today.

The Court has jurisdiction because Williams has been sentenced to death. *See* Ind. Appellate Rule 4(A)(1)(a).

Williams was convicted of two counts of felony murder for two killings committed in the course of a robbery. *See* Ind.Code § 35–42–1–1(2) ("A person who ... kills another human being while committing or attempting to commit ... robbery ... commits murder, a felony."). The State sought the death penalty, alleging an intentional killing during a robbery and the multiple murders. *See* I.C. § 35–50–2–9(b)(1) & (8) (1986). The Lake Superior Court followed the jury's unanimous recommendation and sentenced Williams to death. *See* I.C. § 35–50–2–9(e) (1986).

The convictions and sentence were affirmed on direct appeal in *Rouster v. State*, 600 N.E.2d 1342 (Ind.1992), *reh'g denied* (Ind.1993). The trial court's judgment denying relief in state post-conviction proceedings was affirmed on appeal in *Williams v. State*, 706 N.E.2d 149 (Ind. 1999), *cert. denied*, 529 U.S. 1113, 120 S.Ct. 1970, 146 L.Ed.2d 800 (2000). The federal courts denied a petition for a writ of habeas corpus. *Williams v. Anderson*, 174 F.Supp.2d 843 (N.D.Ind.2001), *aff'd*, *Williams v. Davis*, 301 F.3d 625 (7th Cir. 2002), *cert. denied* —— U.S. ——, 123 S.Ct. 1904, 155 L.Ed.2d 831 (Apr. 28, 2003).

Williams has thus completed the review of his convictions and death sentence to which he is entitled as a matter of right.

### Post-conviction DNA testing and our post-conviction rules

Williams asks leave to perform post-conviction DNA testing under Indiana Code §§ 35–38–7–1 through 19. These statutory provisions allow a person convicted of certain crimes, including murder, to file a petition seeking forensic DNA testing and analysis of evidence that may contain biological evidence related to the investigation or prosecution that resulted in the person's conviction. *See* I.C. §§ 35–38–7–1 & 5. Testing is to be ordered if the convicted person presents "prima facie proof" that, among other things, a reasonable probability exists that the petitioner would not have been prosecuted for or convicted of the offense, or petitioner would not have received as severe a sentence for the offense if "exculpatory results" had been obtained through the requested testing and analysis. I.C. § 35–38–7–8.

Indiana's court system has provided defendants with access to numerous types of expert and scientific evidence, including DNA testing, long before the post-conviction DNA statute became law. *See Hop-kins v. State*, 579 N.E.2d 1297, 1302 (Ind. 1991) (recognizing DNA evidence as admissible in criminal proceedings). We have "regularly approved the admission of DNA identification evidence in criminal prosecutions." *Harrison v. State*, 644 N.E.2d 1243, 1251 & n. 13 (Ind.1995) (citing cases). Access to adequate funds for investigative, expert, and other services is expressly provided for persons charged with the death penalty. *See* Ind. Criminal Rule 24(C)(2); *see also* Norman Lefstein, *Reform of Defense Representation in Capital Cases: The Indiana Experience and Its Implications for the Nation*, 29 IND. L. REV. 495 (1996) (discussing the role of Indiana Criminal Rule 24 in improving the quality of representation in death penalty cases).

DNA testing may demonstrate that a defendant is not guilty of the charge, and if that is the case, testing should be done. *See Young v. State*, 746 N.E.2d 920, 923 n. 1 (Ind.2001) ("We think it is obvious that it would be an abuse of discretion to deny an impecunious defendant funding for a potentially exculpatory DNA test."). *See also Sewell v. State*, 592 N.E.2d 705 (Ind. Ct.App.1992) (granting post-conviction DNA testing before enactment of the statutory scheme), *trans. denied*.

■ A request for post-conviction DNA testing, whether or not made pursuant to the statutory scheme, is a petition for post-conviction relief, and therefore comes within the general rules governing post-conviction proceedings. *See* Ind. Post–Conviction Rule 1 § 1(d).

Our rules permit a person convicted of a crime in an Indiana state court to challenge the conviction and sentence collaterally in a post-conviction proceeding. *See* P–C. R. 1. As indicated above, Williams has already availed himself of a first post-conviction proceeding.

Our rules also specify the procedure for requesting a second, or "successive" post-conviction proceeding. The rule states:

The court will authorize the filing of the petition if the petitioner establishes a reasonable possibility that the petitioner is entitled to post-conviction relief. In making this determination, the court may consider applicable law, the petition, and materials from the petitioner's prior appellate and post-conviction proceedings including the record, briefs and court decisions, and any other material the court deems relevant.

P–C. R. 1 § 12(b). We have considered the applicable law, materials from the prior proceedings, the materials submitted in connection with the tendered successive petition, and the several court decisions.

### The claim for DNA testing

 Williams requests forensic DNA testing be performed on "item 43(a)," which is blood found on the shorts he was wearing when he was arrested the night of the murders and on "item 25," which is blood found on jeans belonging to Edwin Taylor.[1] The principal contention is that "a favorable DNA result" will be "exculpatory" and establish that Williams is entitled to relief from the death sentence. Specifically, the analysis Williams advances is as follows: Evidence at trial showed that the blood on the shorts was the same blood type as that of the victims.

The jury and trial court relied heavily on this evidence when recommending and imposing the death sentence. A favorable DNA test would show that the blood on the shorts did not come from either victim. Without the blood evidence, only "circumstantial evidence" implicates Williams in the murders. If there is no link between the blood on the shorts and the victims, Williams should not be sentenced to death.

We conclude that even if testing were to reveal what Williams hopes it will reveal, such evidence would not be considered exculpatory or indicative that the sentence here is unlawful or inappropriate given the overwhelming weight of the evidence supporting the death sentence.

Williams was tried with Gregory Rouster who was also convicted of two counts of felony murder and sentenced to death.[2] Two others were also charged in connection with the killings and robbery. Theresa Newsome was acquitted. Edwin Taylor pled guilty to robbery and testified for the State. The victims, John Rease, age 74, and his wife, Henrietta Rease, age 59, had been foster parents to Rouster. They were found in the bedroom of their home on August 12, 1986, dead from gunshot wounds. The apparent motive was Rouster's belief that the Reases owed him money they had collected as his foster parents.

Some weeks after Williams was arrested, a state serologist, Kimberly Epperson,

---

1. We can summarily dispose of the request with respect to Edwin Taylor's pants. As indicated below, Taylor pled guilty before trial to robbing the victims. A substantial amount of blood was found on his pants, but the condition of the blood was such that no reliable enzyme test results could be obtained for trial. Nonetheless, we agree with the State that Williams is not entitled to DNA testing of Taylor's pants. Williams does not explain how testing the blood on Taylor's pants would exonerate Williams and we do not perceive any such possibility.

2. The trial court recently found that Rouster, now known as Gamba Rastafari, is mentally retarded, and granted him post-conviction relief from the death sentence pursuant to *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). This judgment is not yet final. *See Rastafari v. State*, Lake Superior Court case no. 2CR–133–886–531 (June 16, 2003 order of the post-conviction court).

found three spots of blood on the front of the shorts near the inseams. Trial Record, p.1953; 1967–68. Having performed enzyme testing, Epperson testified the blood type on the shorts was consistent with the blood of John Rease, Henrietta Rease and Rouster. *Id.* at 1967; 1981–82. She acknowledged that a blood type "match" did not indicate that the blood on the shorts necessarily was that of any of those three people. *Id.* at 1701; 1985. She also noted that forty-five per cent of the world's population has the same blood type as that found on the shorts. *Id.* at 1987–88. The blood could not have come from Williams. *Id.* at 2003.

The State asserted that the blood on the shorts was evidence that Williams was a major participant in the robbery and murders, and argued that Williams was a shooter. Williams attacked the blood evidence by noting the State's failure to produce an expert to testify about how the blood came to be on the shorts, noting the blood could have come from "millions of people" other than the victims and could have come from some place other than their house. *Id.* at 2550; 2594–95 (quoted in *Williams v. State,* 706 N.E.2d at 156).

We do not agree that a favorable result on a DNA test would exonerate Williams from the death penalty. To the contrary, the other evidence overwhelmingly supports the sentence.

■ As every court that has reviewed the death sentence has noted, numerous witnesses place Williams in the house when the shootings occurred. The testimony of the witnesses and other evidence show that Williams participated in the murders. For example, the Seventh Circuit described one witness's testimony:

> Derrick Bryant, a seventeen-year-old foster child who lived with the Reases at the time that the crimes were committed, testified that when Williams and Rouster got to the house, they went into a back room with Henrietta Rease and got into an argument with her about whether the Reases owed Rouster money. After Henrietta Rease asked Rouster to leave the house, Bryant heard Williams say, "I won't let her, she's doing nothing but gypping [Rouster] out of the money." Bryant then heard a series of gunshots and went upstairs into the attic to hide. While in the attic, Bryant heard a conversation take place between Williams, Rouster, and Taylor, whereby Williams and Rouster agreed to rob the Reases at gunpoint. Bryant then ran downstairs to hide behind a stairway and heard Williams and Rouster bring the Reases into the bedroom, at which point Henrietta Rease told Williams not to hit John Rease. Next, Bryant heard Williams state, "it's your time" and heard Rouster reply, "waste them." Bryant then heard a second series of gunshots coming from the bedroom, at which point he ran out of the house and flagged down a police car.

*Williams v. Davis,* 301 F.3d at 627.[3]

The Seventh Circuit noted that the testimony of several neighborhood teenagers

---

**3.** To the extent Williams seeks relief based on some perceived unreliability in Bryant's testimony due to a mental illness or because Bryant's testimony differed from a pre-trial statement given by an Elliott Streeter, Williams has not shown a reasonable possibility he is entitled to relief. Among other things, the materials before us would not support a claim that this evidence is newly discovered. Any claim with regard to Streeter, in particular, is procedurally defaulted for not having been presented timely in state court. *See, e.g., Sanders v. State,* 765 N.E.2d 591, 592 (Ind.2002); *Wrinkles v. State,* 749 N.E.2d 1179, 1187 n. 3 (Ind.2001). The District Court reached the same conclusion. *See Williams v. Anderson,* 174 F.Supp.2d at 867 (finding this issue to be procedurally default-

corroborated Bryant's testimony about the two sets of gunshots after Williams and Rouster were inside. *Id.* In addition, the Seventh Circuit noted:

> [T]he teenagers testified about a third series of gunshots that came from the Reases' house when Rouster and Newsome were in the Reases' front yard, but while Williams presumably was still inside of the house. The teenagers' testimony was corroborated by Lelia Gray, Jimmy Gray's mother, who explained that she saw Williams and Rouster enter the Reases' house, heard two series of gunshots, and also heard a third series of gunshots coming from the Reases' house while Rouster and Newsome were outside.

*Id.* (footnote omitted). The Seventh Circuit acknowledged that no witness actually testified that Williams was in the house when the third group of shots was fired, but nonetheless observed:

> [T]he only time that Williams was seen leaving the house was after the first series of gunshots, when Williams searched for something in the front yard and exclaimed, "my shells." Powell and Pope then saw Williams re-enter the house, and they then heard the second series of gunshots. No one saw Williams leave the house before the third series of gunshots.

*Id.*, n. 3.

In addition, live cartridges of .30 caliber ammunition found on the floor of the victims' home was the same brand found on Williams when he was apprehended after a foot chase with police. *See Rouster*, 600 N.E.2d at 1345.

The aggravating circumstances supporting the death sentence were an intentional killing during the robbery and the multiple murders. Even without the blood evidence admitted at trial, the other evidence described above is sufficient to establish these aggravating circumstances.[4] This is not a case where a DNA test result favorable to Williams will show that he is "innocent" of the aggravating circumstances or that the death sentence would be vacated. Even without the blood evidence, the other evidence is sufficient to support the death penalty. We are not alone in this conclusion. As the Seventh Circuit wrote:

> [T]he trial judge and jury were well-informed of the fact that the blood found on Williams' shorts could have come from somewhere other than the crime scene. For example, Epperson testified that the blood was consistent with the blood of 45% of the population, and thus her testimony showed that there were millions of potential sources of the blood other than the Reases or Williams. Indeed, Williams' counsel seized on this point during closing arguments to note that the blood found on Williams' shorts could have come from "millions of people." Further, Williams' counsel also stated during closing arguments that the State did not present a "splatter" expert, and therefore, the State failed to show that the blood came from the

---

ed in the habeas proceeding under *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999)).

4. This evidence shows the level of culpability constitutionally required for the death penalty whether or not Williams was the actual shooter. *See Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (establishing that "major participation in the felony

committed, combined with reckless indifference to human life" satisfies the constitutional requirement). In the direct appeal we held: "[a]t the least, the facts clearly show that Williams' participation in the felonies was major and that his conduct displayed reckless indifference to human life." *Rouster v. State*, 600 N.E.2d at 1350. Williams does not argue otherwise in this proceeding.

crime scene. Finally, Lach conceded at trial that he observed Williams' clothing on the night that he was arrested, but did not see any blood on it, thus creating a potential inference that the blood got onto Williams' shorts sometime after Lach observed them but before his clothing was confiscated three days later. Therefore, we agree with the Indiana Supreme Court that the facts about which Williams argues competent counsel would have presented at trial were in fact known by the jury when it recommended the death penalty—and by the trial judge when he sentenced Williams to death.

*More importantly, however, Williams was not prejudiced because even without the blood evidence, he still would have been sentenced to death.* Bryant testified that Williams and Rouster agreed to rob the Reases at gunpoint, that Williams encouraged Rouster by telling him not to let the Reases "gyp" him out of the money, and that Williams also threatened the Reases physically. Bryant also heard Williams say "it's your time" followed by Rouster saying "waste them," and then heard several gunshots. Further, Taylor testified during the sentencing hearing that Williams threatened the Reases, pointed a gun at Taylor and asked him where the Reases kept their money, and was the last person he saw with a gun. In addition, the police found .30 caliber cartridges on Williams and in the Reases' bedroom on the night of the murders as well as $232.00 in cash in Williams' pouch. Finally, the neighborhood teenagers testified that they heard a third series of gunshots when Williams was still inside of the Reases' house, but while Rouster was in the Reases' front yard talking to Newsome. The fact that witnesses heard gunshots coming from inside of the house when Rouster and Newsome were outside is strong circumstantial evidence that Williams fired a gun that night.

The cumulative effect of the above-described evidence is that Williams planned the robbery with Rouster, actively participated in the robbery and the murders, and that either Williams or Rouster (or both) fired the gunshots that killed the Reases. *Thus, the evidence—excluding the blood evidence—was sufficient to support the presence of the three aggravating circumstances found by the trial judge.*

*Williams v. Davis,* 301 F.3d at 632–33 (emphasis added).

The arguments Williams presents to the contrary are simply not persuasive. Williams argues that the trial court placed great weight on the blood evidence in sentencing, but the record does not necessarily support that assertion. True, the trial judge's handwritten notes suggest the trial court may have considered imposing a term of years rather than a death sentence. Yet such a consideration is perfectly plausible, especially in a capital case, as the trial court considers the range of possible penalties. *See, e.g., Harrison,* 644 N.E.2d at 1261–62 (describing the trial court's role in selecting the sentence imposed in a capital case). Williams notes the official sentencing order states, "It is also significant that blood spots on Rouster's clothing appeared on the back of his garments and on the front of Williams' shorts." *See Rouster,* 600 N.E.2d at 1351 (quoting the sentencing order). Yet the precise meaning intended by the trial court is obscure in the context of the current request for DNA testing.

Williams has submitted an affidavit from the former Lake County Deputy Prosecutor, Thomas Vanes, who tried the case against Williams. Vanes urges that DNA

testing be used to determine the truth about the blood evidence and that the death sentence be reassessed if DNA testing results are favorable to Williams. *See* Motion for Forensic Testing, Tab 1 (affidavit). Amici propose the "common-sense principle" that if a prosecutor expresses doubts about a conviction obtained by that prosecutor, the doubts deserve careful consideration. We have given careful consideration to the views expressed by Vanes, but consider the evidence in this case to be so strong that even a favorable DNA result would not lead to a different sentence.[5]

Finally, Williams argues that the jury was left with the "false impression" that the blood on the shorts was consistent with Mrs. Rease's blood type. The basis for this claim is the handwritten notation of an enzyme test performed on the blood by the state serologist, Kimberly Epperson. Epperson wrote "1?-" as the test result. *See* Motion for Forensic Testing, tab 5. It appears undisputed that if the result had been simply "1" for this enzyme, the blood sample on the shorts could not have come from Mrs. Rease. Williams claims the notation is "exculpatory" because it suggests that the blood sample could not have come from Mrs. Rease yet Epperson testified at trial that there was a match.

The record simply does not support this claim. Epperson explained the meaning of the notation, indicating that the result of the enzyme test was inconclusive. *See* Post–Conviction Record, p. 2118–19. Thus, Epperson's trial testimony does not conflict with her handwritten note and no evidence renders the note "exculpatory."

Another consideration informs our decision. Counsel for Williams has known for some time that DNA testing was a possible avenue of relief, yet Williams requests testing in state court only now. Even if, as Williams asserts, mitochondrial DNA testing was not technologically feasible when he was litigating in state courts, the technology was available when he litigated his habeas claims in the District Court in 1999. In fact, the same lawyer who represents Williams in this successive post-conviction proceeding asked the District Court to authorize the DNA testing now requested. The District Court denied the request two years ago, but Williams neither requested a stay of the federal proceedings to obtain DNA testing under state court authority nor raised the District Court's ruling as an issue on appeal to the Seventh Circuit. *See Williams v. Davis,* 301 F.3d 625. For all it appears, Williams has waited to request DNA testing in a state court until he exhausted the traditional review available to him and faced the immediate setting of a final execution date.

■ In sum, the petitioner's burden under the DNA testing statutory scheme is to present "prima facie proof" that the evidence sought to be tested is material to identifying the petitioner as the perpetrator and that a reasonable probability exists that the petitioner would not have received as severe a sentence if exculpatory results had been obtained through the requested DNA testing. I.C. § 35–38–7–8(3). The best Williams claims to show by a test is that the blood on his own clothes was not the blood of either victim. For the reasons discussed above, however, such evi-

---

**5.** Referring to the affidavit from Vanes, amici discuss three examples of prosecutorial support for post-conviction testing. The pertinent point in each of these cases, however, was not the opinion of the prosecutor, but whether the DNA evidence was probative of the perpetrator's identity. That is not the claim, however, in the successive post-conviction petition tendered by Williams.

dence would neither be "probative of the perpetrator" nor "exculpatory."

### Conclusion

We conclude that Williams has not met his burden of establishing a reasonable possibility that he is entitled to post-conviction relief. Accordingly, we decline to authorize the filing of a successive petition for post-conviction relief.

Our rules allow Williams thirty days in which to petition for rehearing from this order. *See* App. R. 54(A)(4). However, by separate order, the date for execution of the sentence has been set for August 1, 2003, before the hour of sunrise. *See Williams v. State*, case no. 45S00–9303–PD–397, Order Setting Date for Execution of Death Sentence, entered today. Under the circumstances, we exercise our authority to deviate from our rules and ORDER that any petition for rehearing be physically on file with the Clerk no later than July 7, 2003. *See* App. R. 1. Rehearing should not be sought if Williams simply intends to raise the same arguments already addressed by the Court. A response by the State must be physically on file with the Clerk no later than July 10, 2003. To minimize any delay in the service and receipt of papers, the attorneys are ordered to certify in papers presented for filing that copies have been sent by fax to the Supreme Court Administration office (fax number 317/232–8372), and by fax or electronic mail to the other party's attorney.

The State's motion to set an execution date will be addressed in a separate order.

All Justices concur.