**Kerry J. GREENWELL, Appellant–Petitioner,**

v.

**STATE of Indiana, Appellee–Respondent.**

No. 82A04–0709–PC–524.

Court of Appeals of Indiana.

April 14, 2008.

Susan K. Carpenter, Public Defender of Indiana, C. Brent Martin, Deputy Public Defender, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Scott L. Barnhart, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BRADFORD, Judge.

Appellant–Petitioner Kerry J. Greenwell appeals from the denial of his petition for post-conviction relief ("PCR"). Greenwell contends that the post-conviction court used the wrong standard in evaluating the potential effect of new DNA testing, that a recantation by a state's witness constitutes newly discovered evidence, and that he received ineffective assistance of appellate counsel. We affirm.

## FACTS

The underlying facts of this case were found by the Indiana Supreme Court in its disposition of Greenwell's direct appeal:

On Tuesday, August 1, 1989, the nude body of Debbie Thompson was found on the living room floor of her apartment in Evansville, Indiana. The condition and position of the body strongly suggested a sexual assault; it subsequently was discovered she had been strangled to death with "something flat, either a forearm or possibly a crook of an elbow" and had suffered numerous stab wounds, both pre-and post-mortem, including one to the vagina. It also was discovered that certain personal possessions were missing from the apartment, including a stereo sound system, a VCR, a microwave oven, and a jewelry box.

The victim's husband had left for two weeks of annual training with the Indiana National Guard the previous Saturday, and that evening Debbie was visited in her apartment by appellant and his girl friend Kenya Mattingly who lived together a half-block away. Kenya was hearing-impaired and dependent primarily upon sign language to communicate with others. When appellant and Debbie began conversing through speech, Kenya, noting the absence of Debbie's husband, concluded Debbie was attempting to "date" appellant and in an outburst of frustration initiated a confrontation with Debbie during which she struck her on the head several times with a plastic table leg.

Kenya testified that at some point, appellant was drawn into the affray and he too began assaulting the victim, performing cunnilingus on her, stabbing her, ultimately strangling her to death with his forearm and ejaculating between her legs. Appellant and Kenya then went to their own apartment where appellant changed out of his bloody clothes. Then they returned to the victim's residence where they removed to their own apartment the stereo, jewelry box, and other items. When questioned by police later that month, both appellant and Kenya denied knowing anything about the murder. That fall, they moved to Perry County.

In March of 1990, Kenya was in the Perry County Jail on a battery charge when she contacted the Evansville Police with information that appellant had committed the murder of Debbie Thompson and taken the missing items to his apartment. She told police where the property could be located. Some of the stolen items were recovered from the locations reported by Kenya. Kenya continued to deny any involvement. In April of 1990, when Kenya's palm print was identified on the plastic table leg found next to Debbie's body, police again interviewed her and heard six different versions of events on the night of the murder, each version implicating appellant as the killer but with significant variations as to, *e.g.*, the manner of

death. By her final account to police, death had been by stabbing; at appellant's trial, she testified it had been by strangulation. Kenya was convicted of murder at her own trial in August of 1990.

*Greenwell v. State,* 588 N.E.2d 1269, 1269–70 (Ind.1992). Police collected physical evidence from the crime scene, including samples of carpet taken approximately eight inches from Debbie's vagina that appeared to be stained and pieces of a nearby couch that also appeared to be stained. (Tr. 118). Serologist Janice Lacy detected semen in both samples and concluded that the semen from the carpet could not be attributed to any person and that the semen from the couch was consistent with Greenwell's blood type as well as that of Debbie's husband. (Tr. 423–33). Lacy also testified that thirty-four percent of all persons have a blood type consistent with the semen from the couch. (Tr. 446). Debbie and her husband had had sexual intercourse on the couch cushions the night before he left for guard duty, specifically, July 29, 1989. (Tr. 167). A jury ultimately found Greenwell guilty of murder, and the trial court sentenced him to sixty years of incarceration. (Tr. 763).

On April 10, 2003, Greenwell filed a petition for post-conviction DNA testing and an amended PCR petition. (Appellant's App. 8). On March 25, 2004, a report was issued regarding the DNA testing of evidence gathered at the crime scene, including blood recovered from under Debbie's fingernails and the semen stains found on the carpet and the particle board from the couch. (Appellant's App. 335–38). Samples from the carpet, particle board, and material recovered from Debbie's fingernails were consistent with an untested female. (Appellant's App. 473). The sample from the particle board was contributed by at least two persons, at least one of whom was male. (Appellant's

App. 336). None of the samples tested was consistent with Greenwell. (Appellant's App. 338). Material from the Thompsons' neighbor Jeff Montgomery, Kenya, Debbie, and Debbie's husband was not tested. On June 30, 2005, Kenya testified at a hearing that she had testified falsely at Greenwell's trial and that Montgomery had actually killed Debbie. (PCR Tr. 1–37). On July 27, 2007, the post-conviction court denied Greenwell's PCR petition in full. (Appellant's App. 478).

## DISCUSSION AND DECISION

### Standard of Review

██ Our standard for reviewing the denial of a PCR petition is well-settled:

In reviewing the judgment of a post-conviction court, appellate courts consider only the evidence and reasonable inferences supporting its judgment. The post-conviction court is the sole judge of the evidence and the credibility of the witnesses. To prevail on appeal from denial of post-conviction relief, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite to that reached by the post-conviction court.... Only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion, will its findings or conclusions be disturbed as being contrary to law.

*Hall v. State,* 849 N.E.2d 466, 468, 469 (Ind.2006) (internal citations and quotations omitted).

### I. DNA Evidence

██ Greenwell contends that the post-conviction court applied the wrong standard in concluding that the DNA test results did not entitle him to relief. Indiana provides a statutory framework for post-

conviction DNA testing. Indiana Code section 35–38–7–5 (2002) provides:

A person who was convicted of and sentenced for an offense may file a written petition with the court that sentenced the petitioner for the offense to require the forensic DNA testing and analysis of any evidence that:

(1) is:

(A) in the possession or control of a court or the state; or

(B) otherwise contained in the Indiana DNA data base established under IC 10–13–6;

(2) is related to the investigation or prosecution that resulted in the person's conviction; and

(3) may contain biological evidence.

Before approving the testing, however, Indiana Code section 35–38–7–8 (2002) directs the post-conviction court as follows:

[T]he court shall determine whether the petitioner has presented prima facie proof of the following:

(1) That the evidence sought to be tested is material to identifying the petitioner as:

(A) the perpetrator of; or

(B) an accomplice to; the offense that resulted in the petitioner's conviction.

(2) That a sample of the evidence that the petitioner seeks to subject to DNA testing and analysis is in the possession or control of either:

(A) the state or a court; or

(B) another person, and, if this clause applies, that a sufficient chain of custody for the evidence exists to suggest that the evidence has not been substituted, tampered with, replaced, contaminated, or degraded in any material aspect.

(3) The evidence sought to be tested:

(A) was not previously tested; or

(B) was tested, but the requested DNA testing and analysis will:

(i) provide results that are reasonably more discriminating and probative of the identity of the perpetrator or accomplice; or

(ii) have a reasonable probability of contradicting prior test results.

(4) A reasonable probability exists that the petitioner would not have:

(A) been:

(i) prosecuted for; or

(ii) convicted of; the offense; or

(B) received as severe a sentence for the offense;

if exculpatory results had been obtained through the requested DNA testing and analysis.

If the petitioner makes the required showing and the testing is, in fact, performed, as it was here, the statutory framework directs the post-conviction court's actions depending on the results:

If the results of the postconviction DNA testing and analysis are not favorable to the person who was convicted of the offense, the court:

(1) shall dismiss the person's petition; and

(2) may make any further orders that the court determines to be appropriate, including any of the following:

(A) An order providing for notification of the parole board or a probation department.

(B) An order requesting that the petitioner's sample be added to the Indiana data base established under IC 10–13–6.

Ind.Code § 35–38–7–18 (2002). On the other hand,

[n]otwithstanding any law that would bar a trial as untimely, if the results of

postconviction DNA testing and analysis are favorable to the person who was convicted of the offense, the court shall order any of the following:

(1) Upon motion of the prosecuting attorney and good cause shown, order retesting of the identified biological material and stay the petitioner's motion for a new trial pending the results of the DNA retesting.

(2) Upon joint petition of the prosecuting attorney and the petitioner, order the release of the person.

(3) Order a new trial or any other relief as may be appropriate under Indiana law or court rule.

Ind.Code § 35–38–7–19 (2002).

To summarize, in order to obtain the requested testing, a petitioner must show, *inter alia*, that a "reasonable probability exists that the petitioner would not have ... been ... prosecuted for; or ... convicted of; the offense; or ... received as severe a sentence for the offense; if exculpatory results had been obtained through the requested DNA testing and analysis." Ind.Code § 35–38–7–8(4).[1] Then, after the results are received and determined to be "favorable" or "not favorable," the post-conviction court acts accordingly.

Here, the post-conviction court determined that Greenwell made a *prima facie* showing that entitled him to DNA testing, a determination the State does not contest and one which we believe to be correct. For example, had testing of the semen stain on the carpet excluded Greenwell as a source, the results would have been exculpatory to the extent that it could have raised a reasonable probability that he would not have been convicted had the jury known those results. In other words,

the *potential* for test results that would have entitled Greenwell to relief was there, at least in theory, so the decision to allow the testing was correct. The reality of the results, however, fell short of the potential from Greenwell's standpoint. While the results eliminated Greenwell as a possible source of the semen found on the couch, they did not eliminate him as a possible source of the semen collected from the floor. The post-conviction court determined that those results were "irrelevant and immaterial" in light of the evidence that Debbie and her husband had had sexual intercourse on the couch cushions and the lack of evidence that Debbie had been sexually assaulted on the couch. Appellant's App. pp. 474. The question, however, is not whether the test results were "relevant" but, rather, whether they were "favorable" for purposes of Indiana Code section 35–38–7–19.

 "The interpretation of a statute is a question of law reserved for the courts." *Scott v. Irmeger,* 859 N.E.2d 1238, 1239 (Ind.Ct.App.2007).

A statute should be construed so as to ascertain and give effect to the intention of the legislature as expressed in the statute. In so doing, the objects and purposes of the statute in question must be considered as well as the effect and consequences of such interpretation. When interpreting the words of a single section of a statute, this court must construe them with due regard for all other sections of the act and with regard for the legislative intent to carry out the spirit and purpose of the act. We presume that the legislature intended its language to be applied in a logical manner consistent with the statute's underlying policy and goals. *Rupert v. State,*

---

**1.** The State does not dispute that Greenwell made the showings required by subsections 1–3 of Indiana Code section 35–38–7–8.

717 N.E.2d 1209, 1210 (Ind.Ct.App. 1999). Statutes relating to the same general subject matter are in pari materia and should be construed together so as to produce a harmonious statutory scheme. *Brooks v. Gariup Constr. Co.,* 722 N.E.2d 834, 838 (Ind.Ct.App.1999), *trans. denied.* Courts are not bound to adopt a construction that would lead to manifest absurdity in order that the strict letter of the statute may be adhered to. *Simms v. State,* 421 N.E.2d 698, 701 (Ind.Ct.App.1981). They will rather look to the intention of the legislature, as gathered from the import of the whole act, and will carry out such intention as thus obtained. *Id.* Though penal laws are to receive a strict construction, they are not to be construed so strictly as to defeat the obvious or expressed intent of the legislature. *Id. Fuller v. State,* 752 N.E.2d 235, 237–38 (Ind.Ct.App.2001).

One might argue that the DNA test results were "favorable" to Greenwell in that they negated one piece of the evidence used against him. We conclude, however, that more is required to satisfy Indiana Code section 35–38–7–19. Favorable may be defined as "[a]dvantageous" or "helpful," so it follows that if the results would not have actually afforded Greenwell an advantage or helped him at trial, they are not "favorable." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE PAPERBACK EDITION 261 (Peter Davies ed., Dell Publishing Co.1970). The question that remains, then, is what threshold of advantage or helpfulness Greenwell must meet in order to be entitled to relief.

In light of what we believe to be the obvious legislative intent and spirit of Indiana Code chapter 35–38–7, "Postconviction DNA Testing and Analysis," we conclude that the "favorable" threshold should be based on the standard for obtaining testing in the first place, *i.e.,* whether the results are such that there is a reasonable probability that the verdict or sentence would have been different had they been available at trial. The legislative intent behind chapter 35–38–7 is to provide a statutory mechanism for the testing of biological samples and for the release or retrial of certain convicted defendants when test results undermine confidence in the original disposition. The chapter, however, also includes a "gatekeeper" provision, in the form of section 35–38–7–8, essentially directing the post-conviction court to deny requests for testing when the potential results, even if in some sense "positive," would have been, at best, of marginal or dubious help at trial. It would make little sense, then, to grant a petitioner relief based on similarly marginal or dubious actual test results.[2]

Applying that test here, we conclude that there is no reasonable probability that

---

**2.** To see why this is so, one need only imagine what would have happened in this case had no semen stain been found on the carpet. If Greenwell had then requested testing of the semen sample from the couch, the post-conviction court would have been correct in denying the request, as a test excluding him would not have generated a reasonable probability that he would not have been convicted had the jury heard the results. So, in that hypothetical case, because there was no potential for more exculpatory results, Greenwell's request for testing would never have been approved. In the end, granting Greenwell relief here would be, in effect, to grant him relief based on that exculpatory potential and *not* the actual exculpatory effect of the test results, simply because those results happened to be minimally "favorable." While it makes perfect sense to grant a request for DNA testing where the potential exists for highly exculpatory results, it would be absurd to grant *relief* based on that potential for exculpatory test results rather than the test results themselves.

the availability of a DNA test result excluding Greenwell as the source of the semen on the couch would have changed either the verdict or sentence at his trial. In light of the other evidence presented at trial, we find it highly unlikely that the jury relied in any great measure on evidence that Greenwell could have been the source of the semen on the couch in reaching its verdict. Kenya testified that Greenwell stabbed Debbie several times, strangled her, and ejaculated between her legs, all of which is consistent with the physical evidence. Kenya also testified that she and Greenwell took several items from Debbie's apartment, and the jury heard testimony that Greenwell later sold some of those items to various persons and caused his mother to take other items from the home he shared with Kenya.

Moreover, the way in which the evidence regarding the semen stain from the couch was presented and argued tended to minimize its impact, making it even more unlikely that the jury relied heavily on it. By the time the jury heard testimony that Greenwell could have contributed the semen on the couch, it had already heard that Debbie and her husband had had sexual intercourse on the couch cushions the night before her death. (Tr. 167). Furthermore, immediately after the jury heard that Greenwell could have been the source of the semen on the couch, it heard that Debbie's husband was also a possible source. (Tr. 432–33). The State's use of the blood type evidence in this way, *i.e.,* implying that the semen could have come from Debbie's killer while, at the same time, providing evidence of another, more plausible way in which it could have found its way onto the couch, certainly blunted whatever impact it might have had on the jury.

The way in which the parties argued the import of the semen stain on the couch also tended to minimize its impact on the jury. It is true that the State argued that its proximity to Debbie's body "strongly suggest[ed] that that semen [on the couch] was left by the killer" and the fact that the only two seminal stains were found in the room with Debbie's body "suggest[ed]" that Greenwell was the person who provided both stains. On the other hand, whatever impact these suggestions might have had on the jury was blunted by subsequent argument. Tr. p. 624. For his part, Greenwell forcefully argued that the semen on the couch "almost certainly came from being rubbed off the pillows when [Debbie and her husband] made love the night before or having rubbed off the pillows on another occasion or when they made love on the couch at one time or another." Tr. pp. 642–43. Finally, on rebuttal the State argued that even the semen stain on the *carpet* was not its "biggest piece of evidence" and that, even if the jury believed that it had nothing to do with Debbie's murder, "that doesn't make Kerry Greenwell not guilty." Tr. pp. 672, 673. In our view, the strength of the other evidence presented, coupled with the weakness of the couch stain evidence, makes it unlikely that the jury relied on the couch stain evidence to any great extent. In summary, the results of the DNA testing did not create a reasonable probability that, had they been known, they would have changed the result of Greenwell's trial or the sentence he received.

Our conclusion is supported by *Williams v. State,* 791 N.E.2d 193 (Ind.2003). Williams and another had been convicted of the shooting murders of two persons during the course of a robbery, and Williams ultimately was sentenced to death. *Id.* at 194–95. In its disposition, the Indiana Supreme Court concluded that Williams was not entitled to have DNA testing done on the shorts he was wearing the night of the murders on which were

found three drops of blood.[3] *Id.* at 197. At Williams's trial, a serologist had testified that the blood on the shorts could have come from the two victims but not from Williams, which the State had asserted showed that Williams "was a major participant in the robbery and murders" and showed that Williams was a shooter. *Id.* at 197. The serologist, however, had also noted that forty-five percent of the world's population shared the blood type of the sample found on the shorts and that the sample had not necessarily come from the victims. *Id.* Additionally, Williams attacked the evidence by noting the State's failure to explain how the blood came to be on the shorts while also pointing out that it could have come from "millions of people" other than the victims. *Id.* The *Williams* court, in concluding that DNA testing was not warranted, noted that "numerous witnesses place[d] Williams in the house when the shooting occurred" and that live cartridges of .30 caliber ammunition were the same brand as those found on Williams when he was apprehended. *Id.* at 197, 198.

When considered in its entirety, we believe that the other evidence used to convict Greenwell was just as compelling, if not more so, than the other evidence used to convict Williams. Although only one eyewitness placed Greenwell at the scene of Debbie's murder, the jury believed that witness, and she not only placed him at the scene but also described his direct participation in the murder, a description consistent with all of the physical evidence. Moreover, the jury heard testimony that Greenwell stole several items from Debbie's apartment shortly after he killed her and that he sold some of those items to

various persons in the following months. In the absence of another explanation for Greenwell's possession of the items, we find this evidence also to be significantly incriminating.

We also conclude that the State relied less heavily on the couch stain evidence here than it did on the blood stains from Williams's shorts in his trial. First, the State relied much more heavily on the semen stain from the floor, and it has never been shown that Greenwell could not have been *its* source. Second, in contrast to *Williams*, the State itself presented a second, more plausible explanation for the semen stain on the couch. Finally, our evaluation of the record is that the overall effect of the couch stain evidence was, at most, to suggest Greenwell's presence, especially when the State argued that the jury need not consider the semen evidence at all in finding Greenwell guilty. In the end, as with the evidence at issue in *Williams*, the overall effect of the couch stain evidence was minimal, such that Greenwell is entitled to no relief on this claim.

## II. Newly Discovered Evidence

■■■■ Greenwell contends that Kenya's recantation of her trial testimony, identifying Montgomery, and not him, as the murderer, is newly discovered evidence that entitles him to a new trial.

[N]ew evidence will mandate a new trial only when the defendant demonstrates that: (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due dili-

---

**3.** The question in *Williams* was whether he had made the *prima facie* showing required by Indiana Code section 35–37–7–8, rather than whether DNA test results entitled him to relief. As we have previously concluded,

however, the standard for evaluating both questions is essentially the same, and, as such, we consider *Williams* binding authority on this point.

gence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial. *See* *Fox v. State*, 568 N.E.2d 1006, 1007 (Ind. 1991). This Court analyzes these nine factors with care, as "[t]he basis for newly discovered evidence should be received with great caution and the alleged new evidence carefully scrutinized." *Reed v. State*, 508 N.E.2d 4, 6 (Ind.1987).

*Carter v. State*, 738 N.E.2d 665, 671 (Ind. 2000).

The post-conviction court issued no conclusions regarding Greenwell's claim of newly-discovered evidence, nor did it specify any specific basis for rejecting Greenwell's claim in this regard. The post-conviction court, however, did note several inconsistencies and implausibilities in Kenya's PCR testimony in its findings. Specifically, the post-conviction court noted that Kenya testified that Montgomery grabbed her and prevented her from fleeing the murder scene, apparently while nude and raping Debbie, and that he then allowed her and Greenwell to steal several items from the apartment. (Appellant's App. 464). This obvious skepticism, along with the post-conviction court's denial of Greenwell's claim, lead us to conclude that the post-conviction court simply did not find Kenya's testimony worthy of credit. *See, e.g., Webster v. State*, 699 N.E.2d 266, 269 (Ind.1998) ("Although determining the credibility of witnesses is normally the function of the jury, when ruling on a motion for new trial based on newly discovered evidence the trial court must assess the credibility of any proffered new evidence."). Consequently, Greenwell has failed to satisfy one of the nine required elements and his claim for relief based on newly discovered evidence must fail.

### III. Ineffective Assistance of Appellate Counsel

 Greenwell contends that his appellate counsel was ineffective for failing to challenge his sentence on direct appeal.

The standard for gauging appellate counsel's performance is the same as that for trial counsel. Therefore, to prevail on an ineffective assistance of counsel claim, the petitioner must show both deficient performance and resulting prejudice. As for the first prong—counsel's performance—we presume that counsel provided adequate representation. Accordingly, counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference. The second prong— the prejudicial effect of counsel's conduct—*requires a showing that there is a* reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Allen v. State*, 749 N.E.2d 1158, 1166–67 (Ind.2001) (internal citations, quotation marks, and brackets omitted).

 In sentencing Greenwell to the then-maximum sixty years of incarceration following his conviction of murder, the trial court found, as aggravating circumstances, the nature and circumstances of the crime, that the imposition of a reduced sentence would depreciate the seriousness of the crime, and that Greenwell was in need of correctional or rehabilitative treatment that could best be provided by his commitment to a penal institution. (Tr. 762–63). At the time Greenwell's direct appeal was decided, the Indiana Supreme Court used the following standard in reviewing sentences:

Sentencing is conducted within the discretion of the trial court and will be

reversed only upon a showing of a manifest abuse of that discretion. It is within the discretion of the trial court to determine whether a presumptive sentence will be increased or decreased because of aggravating or mitigating circumstances.... When a sentencing court enhances a presumptive sentence, the record must demonstrate that the determination was based upon the consideration of the facts of the specific crime, the aggravating and mitigating circumstances involved, and the relation of the sentence imposed to the objectives which will be served by that sentence. The trial court's statement must identify all significant mitigating and aggravating circumstances, include a specific reason why each circumstance is mitigating or aggravating, and weigh mitigating circumstances against the aggravating factors.

*Sims v. State*, 585 N.E.2d 271, 272 (Ind. 1992) (internal citations and quotation marks omitted).

Greenwell contends that the trial court abused its discretion in finding, as aggravating circumstances, that the imposition of a reduced sentence would depreciate the seriousness of the crime and that Greenwell was in need of correctional or rehabilitative treatment that could best be provided by his commitment to a penal institution. As the State concedes, the trial court's consideration of the first aggravating circumstance was improper under precedent extant at the time. *See Evans v. State*, 497 N.E.2d 919, 923 (Ind.1986). As the State points out, however, the trial court's consideration of the latter aggravating circumstance, although later condemned, was acceptable at the time. *See, e.g., Sweany v. State*, 607 N.E.2d 387, 390 (Ind.1993).

Be that as it may, however, our review of the trial court's statements at sentencing leads us to conclude that it relied almost exclusively on the facts and circumstances of the crime to enhance Greenwell's sentence. As the trial court noted,

Mr. Greenwell's criminal conduct was an unprovoked, brutal, mutilation slaying during which he sexually abused the victim as she lay dying or dead. In further aggravation of his criminal episode, he combined with another, namely, Kenya Mattingly to steal almost every item of the victim's property which had significant value even removing the victim's wedding ring from her lifeless hand. On the whole, Mr. Greenwell's conduct was savage and bone chilling, evidencing a perverted mind and a heart devoid of social constraint.

Tr. p. 762. In contrast, the trial court essentially recited the statutory text of the other two aggravating circumstances.

Moreover, in light of the circumstances surrounding Debbie's murder, we believe that the Indiana Supreme Court would not have reduced his sentence had he challenged it. As such, Greenwell was not prejudiced by his appellate counsel's failure to raise this issue, if it was a failure. We believe that the 1992 Indiana Supreme Court would have concluded, as we have, that Greenwell's murder of Debbie was, indeed, considerably more heinous than most. The trial court succinctly summarized the evidence, which revealed that Debbie was stabbed several times, both while alive and, apparently, after her death by strangulation. Debbie's killers also mutilated her body, stabbing her, among other places, in her vagina. Greenwell also sexually assaulted Debbie's dead or dying body, performing cunnilingus on her and attempting to ejaculate on her. Greenwell and Kenya also stole several items from Debbie's apartment, going so far as to take her wedding ring from her lifeless finger. Whether the ultimate

motive for killing Debbie was jealousy, as Kenya's testimony seemed to suggest, or greed, as the couple's subsequent actions seemed to suggest, or a combination of the two, it was, in the end, particularly senseless and brutal. Because Greenwell's sentence challenge would not have been successful, we conclude that he received effective assistance of appellate counsel.

### Conclusion

We conclude that the post-conviction court properly denied Greenwell's claims that DNA test results and newly discovered evidence entitled him to relief and that he received ineffective assistance of appellate counsel.

We affirm the judgment of the post-conviction court.

BAKER, C.J., and DARDEN, J., concur.