Darnell WILLIAMS, Petitioner,

v.

STATE of Indiana, Respondent.

No. 45S00–0306–SD–248.

Supreme Court of Indiana.

July 25, 2003.

**ORDER**

SULLIVAN, Acting Chief Justice.

### I. Introduction

Darnell Williams has been convicted of two murders and sentenced to death, and

execution of the sentence is set for August 1 before sunrise. By counsel, he has filed a "Petition For the Consideration of New Evidence Pursuant to Indiana Code 35–50–2–9(k)," accompanied by sixteen exhibits. The State filed "State's Response In Opposition To Petition For Consideration Of New Evidence."

Williams raises several claims in his petition. He asserts these claims entitle him to relief under a new Indiana statute. The statute at issue provides generally that this Court shall determine whether the petitioner has presented "previously undiscovered evidence that undermines the confidence in the conviction or the death sentence." See P.L. 147–2003, § 1 amending Ind.Code § 35–50–2–9(k). The statute applies in only a narrow category of cases— by its terms, to those death sentences following completion of post-conviction review procedures and involving "previously undiscovered evidence." *Id.* Although a number of the claims made by Williams do not fall into this category, we have elected to give all his claims review on the merits under Post–Conviction Rule 1 § 12, which provides the possibility for relief in a broader category of cases. We conclude that under either the new statute or our post-conviction rules, Williams is not entitled to relief. Accordingly, and for the reasons discussed below, the "Petition for the Consideration of New Evidence Pursuant to Indiana Code 35–50–2–9(k)" is denied.

## II. Historical background of this case

Williams was convicted of two counts of felony murder for two killings committed in the course of a robbery. See Ind.Code § 35–42–1–1(2) ("A person who ... kills another human being while committing or attempting to commit ... robbery ... commits murder, a felony."). The State sought the death penalty, alleging an intentional killing during a robbery and the multiple murders as the required aggravating circumstances. See I.C. § 35–50–2–9(b)(1) & (8) (1986). The Lake Superior Court followed the jury's unanimous recommendation and sentenced Williams to death. See I.C. § 35–50–2–9(e) (1986).

Williams was tried with Gregory Rouster, who was also convicted of two counts of felony murder and sentenced to death. Two others were also charged in connection with the killings and robbery. Theresa Newsome was acquitted. Edwin Taylor pled guilty to robbery and he testified for the State. The victims, John Rease, age 74, and his wife, Henrietta Rease, age 59, had been foster parents to Rouster. They were found in the bedroom of their home on August 12, 1986, dead from gunshot wounds. The apparent motive was Rouster's belief that the Reases owed him money they had collected as his foster parents.

The convictions and sentence with respect to Williams were affirmed on direct appeal in *Rouster v. State,* 600 N.E.2d 1342 (Ind.1992), *reh'g denied* (Ind.1993). The trial court's judgment denying relief in state post-conviction proceedings was affirmed on appeal in *Williams v. State,* 706 N.E.2d 149 (Ind.1999), *cert. denied,* 529 U.S. 1113, 120 S.Ct. 1970, 146 L.Ed.2d 800 (2000). The federal courts denied a petition for a writ of habeas corpus. *Williams v. Anderson,* 174 F.Supp.2d 843 (N.D.Ind.2001), *aff'd, Williams v. Davis,* 301 F.3d 625 (7th Cir.2002), *cert. denied* —— U.S. ——, 123 S.Ct. 1904, 155 L.Ed.2d 831 (Apr. 28, 2003).

Williams has thus completed the traditional review of his convictions and death sentence to which he is entitled as a matter of right.

In addition, last month, Williams tendered a successive post-conviction petition requesting that certain blood evidence be subjected to DNA testing. We acknowledged that DNA testing can provide im-

portant information about the appropriateness of a death sentence, but concluded that even a favorable test result for Williams would not call into question his guilt for the murders or the appropriateness of the death sentence. The request for DNA testing was denied. *See Darnell Williams v. State,* 791 N.E.2d 193 (Ind. 2003) (Order of June 27, 2003); *reh'g denied* (Order of July 22, 2003).

Execution of the sentence has been ordered for August 1, 2003 before sunrise.

### III. Framework for analyzing the claims

As noted above, Williams has attempted to fit all his claims within the rubric of a new statute which states as follows:

A person who has been sentenced to death and who has completed state post-conviction review proceedings may file a written petition with the supreme court seeking to present new evidence challenging the person's guilt or the appropriateness of the death sentence if the person serves notice on the attorney general. The supreme court shall determine, with or without hearing, whether the person has presented previously undiscovered evidence that undermines confidence in the conviction or the death sentence. If necessary, the supreme court may remand the case to the trial court for an evidentiary hearing to consider new evidence and its effect on the person's conviction and death sentence. The supreme court may not make a determination in the person's favor nor make a decision to remand the case to the trial court for an evidentiary hearing without first providing the attorney general with an opportunity to be heard on the matter.

Ind.Code § 35–50–2–9(k) (2003). The statute went into effect just weeks ago, on July 1, 2003.

By its own terms, the statute limits our consideration to claims involving "previously undiscovered evidence" that have been presented to us. Williams has made claims here that do not fall into that category.

However, we have court rules that, like the statute, also can provide an avenue for relief for a "person who has been sentenced to death and who has completed state post-conviction relief proceedings." *See generally* Indiana Post–Conviction Rules. Our rules permit a convicted person who has already completed post-conviction proceedings to request a second or additional successive opportunity for post-conviction relief. *See* Ind. P–C. R. 1 § 12(a). The categories of cases in which relief may be sought under these rules are broader than those allowed under the statute cited by Williams. *Compare* P–C. R. 1 § 1(a) *with* Ind.Code § 35–50–2–9(k) (2003). Under our successive post-conviction rules, the court will authorize the filing of a successive petition seeking post-conviction relief "if the petitioner establishes a reasonable possibility that the petitioner is entitled to post-conviction relief." P–C. R. 1 § 12(b). As noted above in the history of this litigation, Williams has already availed himself of the successive post-conviction rule once.

The question of whether Indiana Code § 35–50–2–9(k) as amended provides a different analytical form of review for the narrow category of cases to which it applies or whether it otherwise adds anything new to the capital jurisprudence of Indiana are not questions we need resolve now. As of the time Williams filed his petition, we had not spoken on these issues and we have therefore analyzed each claim using the language of the new statute insofar as the claim involves new and previously undiscovered evidence. In order to provide Williams with review on the merits of

all the claims he has made, we have applied the language of our successive post-conviction rule to the extent his claims do not involve previously undiscovered evidence.

### IV. The claims

For ease of reference, we refer to each of the claims in the same order in which Williams has raised them.

1. **Williams has received an individualized sentencing determination, independent of a co-defendant's ineligibility for a death sentence.**

   ██ Williams notes that a post-conviction court recently found that co-defendant Rouster, now known as Gamba Rastafari, is mentally retarded, and granted him post-conviction relief from the death sentence pursuant to *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). *See Rastafari v. State*, Lake Superior Court case no. 2CR–133–886–531 (June 16, 2003 order of the post-conviction court). Petition, Exhibit 1. (The State indicates that it has filed a notice of appeal from that judgment.) He also calls our attention to various items in the record that he contends indicate that both the jury and the trial judge thought Rouster was more culpable than Williams.

   Williams argues that these facts render his death sentence disproportionate, unreliable, and excessive under Article 1, section 16, and Article 7, section 4 of the Indiana Constitution, Indiana Appellate Rule 7(B), and the Eighth and Fourteenth Amendments to the United States Constitution but he cites no authority for this proposition.

   That Rouster's death sentence has been vacated because Rouster is mentally retarded has no bearing on the lawfulness of the sentence Williams received. Williams is entitled to and has received an individualized sentencing determination. *See*

*Williams v. State*, 706 N.E.2d at 159 (citing *Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)); *Rouster v. State*, 600 N.E.2d at 1350–51. This Williams has received.

To the extent this claim involves anything that could be characterized as previously undiscovered evidence, given the weight of all the other evidence in this case and the level of judicial scrutiny applied by the state and federal courts that have repeatedly reviewed this case, Williams has not presented anything that undermines confidence in the conviction or the death sentence. *See* Ind.Code § 35–50–2–9(k) (2003). To the extent this claim involves the consideration of anything outside the realm of previously undiscovered evidence, Williams has not established a reasonable possibility that he is entitled to post-conviction relief. *See* P–C. R. 1 § 12(b).

2. **Four items of evidence concerning whether Williams was a "triggerman" do not constitute "previously undisclosed evidence."**

   Williams contends that there are four items of evidence that he characterizes as "previously undiscovered" that suggest that he was not a "triggerman" in the murders of the Reases.

   ██ The first item identified by Williams is the statement of Elliott Streeter. *See* Submission of Habeas Exhibits, Habeas Exhibit D. The trial testimony described several episodes of gun shots occurring at different times. Streeter's statement, if believed, would place Williams outside the Rease house when one episode of shooting was heard. Streeter was not called as a witness at trial.

   The Streeter statement is not "previously undiscovered evidence" for at least two reasons. First, it was disclosed to counsel

before trial. Trial Record, p. 24. Second, Williams argued in the first post-conviction proceeding that his attorney should have called Streeter as a witness, but the post-conviction court denied relief on the claim. Post–Conviction Record, p. 1320–21. The post-conviction court expressly found that Streeter's testimony "would not have been sufficient to rebut the testimony of the other eyewitnesses who put the petitioner in the house at critical points during the robbery and killings." *Id.* at 1321. Williams did not raise any claim of error in this finding in the post-conviction appeal. (In the federal habeas proceeding, Williams also argued that trial counsel had been ineffective for failing to review Streeter's statement, but lost. *See Williams v. Anderson,* 174 F.Supp.2d at 867 (finding issue to be procedurally defaulted in the habeas proceeding under *O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999))).

■ The second item consists of mental health records relating to witness Derrick Bryant that Williams contends show Bryant's incriminating testimony was not worthy of belief. Petition, Exhibit 4. This also is not previously undiscovered evidence. Defense counsel raised the issue of Bryant's mental health at trial. Trial Record, p.2064 (discussing whether such evidence would be admissible). Williams did not raise any issue with respect to these records in his previous appeals to us. Williams presented these records to the federal district court in the habeas proceeding. (In the federal habeas proceeding, Williams argued the prosecutor engaged in misconduct by not disclosing Bryant's mental health history, but lost. *See Williams v. Anderson,* 174 F.Supp.2d at 875 (finding issue to be procedurally defaulted in the habeas proceeding under *O'Sullivan,* 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1)).

■ The third item relates to test results recorded by the state serologist, Kimberly Epperson, who performed enzyme testing on the blood found on the shorts Williams was wearing when he was arrested. Petition, Exhibit 5. Williams claims that Epperson's notation about one test result is exculpatory but was not disclosed to Williams before trial. The record, however, indicates that the notation is not previously undiscovered evidence. Williams questioned Epperson about the notation in the first post-conviction proceeding. (Epperson explained that the notation meant the particular test result was inconclusive.) *See* Post–Conviction Record, p. 2118–19. In addition, we addressed this claim in our order denying the request for DNA testing. *Darnell Williams v. State,* 791 N.E.2d 193 (Ind. 2003) (Order of June 27, 2003, p. 9). We continue to believe that the notation by Epperson is not exculpatory under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■ The fourth item relates to the request for DNA testing on the blood spots on the shorts Williams was wearing when he was arrested. This also is not previously undiscovered evidence; it was the subject of our June 27, 2003 order after considering the argument at length. Williams also asked the federal district court for authorization to test this evidence. (The request was denied and not appealed.)

We remain of the opinion that:

The evidence to be tested is not evidence that would reveal the DNA of the guilty person and confirm or negate the guilt of Williams. Rather, it is blood found on clothing of Williams and Taylor that the prosecution suggested came from the victims. Williams hopes the DNA tests will indicate that the blood on his shorts came from someone other

than the two murder victims. If the tests were to reach that conclusion, he claims such results would be "exculpatory," and he would be entitled at least to reconsideration of his death sentence. Williams, however, was convicted of two murders in the course of a robbery, and his guilt was established at trial by an overwhelming body of evidence independent of the blood samples Williams seeks to test. We agree with the federal courts, which have also examined the significance of the blood evidence, and conclude that the death sentence is appropriate. Even if testing established the blood to be from someone other than the victims, the other evidence of guilt stands unrefuted and blood from another source is consistent with the conviction and death penalty in this case.

Order of June 27, 2003, p. 1.

The only thing new Williams presents with the pending petition are the statements of three of the people who, in 1987, sat on the jury that recommended the imposition of the death penalty. See Petition, Exhibits 6, 7, 8. Counsel for Williams has tracked down these three individuals, and they have signed statements saying they favor additional DNA testing. Two of them now say, sixteen years after the fact, they would have voted differently with regard to imposing the death sentence if different evidence would have been presented at the trial.

While perhaps "new," these statements are not "evidence." Under Indiana and Federal Evidence Rules 606(b), there are only limited circumstances, such as when an illegal or prejudicial outside influence affected the verdict, in which a former juror may testify as to the validity of a verdict. This is not one of those limited circumstances and Williams makes no claim to the contrary. He does not contest that the testimony of jurors cannot be

considered to impeach their verdict. *Solomon v. State*, 439 N.E.2d 570, 578 (Ind. 1982). Otherwise, post-verdict testimony and affidavits would allow a dissatisfied juror to defeat a verdict to which the juror had earlier assented, diminish the sanctity of verdicts, make no verdict ever final, permit or encourage harassment of former jurors, and defeat the acts of jurors performed under oath. *See Majors v. State*, 773 N.E.2d 231, 237 (Ind.2002), *citing Griffin v. State*, 754 N.E.2d 899, 902 (Ind. 2001), *citing inter alia, Taylor v. Garnett*, 110 Ind. 287, 11 N.E. 309 (1887).

To the extent these four items submitted to the Court involve anything that could be characterized as previously undiscovered evidence, given the weight of all the other evidence in this case and the level of judicial scrutiny applied by the state and federal courts that have repeatedly reviewed this case, Williams has not presented anything that undermines confidence in the conviction or the death sentence. *See* Ind. Code § 35–50–2–9(k) (2003). To the extent this claim involves the consideration of anything outside the realm of previously undiscovered evidence, Williams has not established a reasonable possibility that he is entitled to post-conviction relief. *See* P–C. R. 1 § 12(b).

3. **Neither the statement of a former deputy prosecutor nor the *Atkins* decision are evidence of changed community standards that entitle Williams to relief.**

■ Williams presents the opinion of the trial prosecutor, Thomas Vanes, that it is "unlikely that the death penalty would be sought against Williams if the case were first prosecuted today." Petition, Exhibit 9. Such a statement is not evidence that community standards have in fact changed. And, as the State notes, prosecutors have filed death penalty charges in

cases involving multiple murders since Williams was tried. The only authority Williams cites is *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which identified a national consensus against executing mentally retarded persons, but did not identify any consensus or evolving standards of the nature Williams asserts here.

To the extent this claim involves anything that could be characterized as previously undiscovered evidence, given the weight of all the other evidence in this case and the level of judicial scrutiny applied by the state and federal courts that have repeatedly reviewed this case, Williams has not presented anything that undermines confidence in the conviction or the death sentence. *See* Ind.Code § 35–50–2–9(k) (2003). To the extent this claim involves the consideration of anything outside the realm of previously undiscovered evidence, Williams has not established a reasonable possibility that he is entitled to post-conviction relief. *See* P–C. R. 1 § 12(b).

**4. Additional mitigation evidence, collected in the first post-conviction proceeding, was cumulative of the large amount of mitigation evidence presented at trial following reasonable investigation by counsel.**

■ Williams has submitted a report by social worker Jill Miller, which describes the environment in which Williams was raised, and a report by registered nurse, Jean Thompson, which describes brain injuries at birth that Williams may have suffered. Petition, Exhibits 10 and 11. Williams cites a recent U.S. Supreme Court case, *Wiggins v. Smith*, — U.S. ——, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), for the proposition that reasonable investigation of mitigating circumstances is required in capital cases.

Neither report contains previously undiscovered evidence. Both were tendered as exhibits in the first post-conviction proceeding. In the post-conviction appeal, we affirmed the post-conviction court's refusal to admit these exhibits because of "the large amount of evidence already available on Williams' difficult childhood." *Williams v. State*, 706 N.E.2d at 163–164. This "large amount of evidence ... on Williams' difficult childhood" was presented by counsel as evidence of mitigating circumstances at trial. Indeed, it was the weight he attributed to this large amount of evidence that formed the basis of Justice DeBruler's dissent. *Rouster*, 600 N.E.2d at 1352–53 (DeBruler, J., dissenting). (The federal court denied a related claim in the habeas proceeding. *Williams v. Anderson*, 174 F.Supp.2d at 872–73). We see no evidence that counsel's investigation was not reasonable within the meaning of *Wiggins*.

To the extent this claim involves anything that could be characterized as previously undiscovered evidence, given the weight of all the other evidence in this case and the level of judicial scrutiny applied by the state and federal courts that have repeatedly reviewed this case, Williams has not presented anything that undermines confidence in the conviction or the death sentence. *See* Ind.Code § 35–50–2–9(k) (2003). To the extent this claim involves the consideration of anything outside the realm of previously undiscovered evidence, Williams has not established a reasonable possibility that he is entitled to post-conviction relief. *See* P–C. R. 1 § 12(b).

**5. Williams is not entitled to relief under Appellate Rule 7(B).**

■ With respect to this claim, Williams invokes Appellate Rule 7(B), which provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in

light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B).

We reviewed the appropriateness of the sentence in the direct appeal, *Rouster v. State*, 600 N.E.2d at 1350–1351. In addition, we again considered the evidence supporting the sentence when deciding the petition for DNA testing. We decline to review the sentence at this stage.

### 6. Williams has made no showing that he is entitled to relief under *Atkins*.

■ Williams contends for the first time in this petition that "[t]here is a very real chance that [he] is mentally retarded." Last year, the United States Supreme Court declared that execution of a mentally retarded person is an "excessive sanction" that violates the Eighth Amendment to the United States Constitution. *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Mentally retarded persons are regarded as less culpable, *Atkins* says, because they have

> diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, to understand the reactions of others .... [T]here is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.

*Id.* at 318, 122 S.Ct. 2242 (footnotes omitted).

Although *Atkins* was decided after the death sentence in this case was final, we apply *Atkins* retroactively, as we did for Rouster. *See Penry v. Lynaugh*, 492 U.S. 302, 330, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (in which the Supreme Court indicated that a constitutional prohibition against execution of mentally retarded persons would apply to defendants on collateral review).

Williams has not presented any previously undiscovered evidence with respect to this claim. Petition Exhibits 10 through 16 relate to the claim of mental retardation. The bulk of this information is also found in the Post–Conviction Record. The evidence in the record shows two full scale I.Q. tests administered when Williams was a child. In 1976, at age ten, Williams scored 78. Post–Conviction Record, p. 3475. In 1980, at age thirteen, he scored 81. *Id.* at 3484. A psychologist, LaVerne Osmon, recommended that Williams be placed in an "educable class of special education." *Id.* at 3475. He apparently continued in this program throughout high school, although he may have attended some "regular" classes. In 1983, a school social worker, Jane Gibbs, noted that Williams had made a good adjustment to school, attended regularly, and "has good discipline and self-respect." He was passing all of his classes. He graduated in 1984, with a class rank of 129 out of 385 students. *Id.* at 2922 (presentence report). After high school, he was variously employed in construction work, at a plastic factory, and, at the time of the murders, at a nursing home. He apparently had plans to marry the young woman who was with him at the Reases. He reportedly paid this young woman's living expenses.

*Atkins* cites definitions of mental retardation from the American Association of Mental Retardation and the American Psychiatric Association. 536 U.S. at 308, n. 3, 122 S.Ct. 2242. Each of those sources defines mental retardation as requiring (1) significantly subaverage intellectual functioning and (2) limitations in adaptive skills, both of which manifest before the person reaches eighteen years of age. Adaptive skill areas include communication, self-care, home living, social skills,

use of community resources, self-direction, health and safety, functional academics, leisure, and work. " 'Mild' mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70." *Id.* "An IQ between 70 and 75 or lower, ... is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Id.* at 309, n. 5, 122 S.Ct. 2242.

Williams does not point us to any opinion, expert or otherwise, that he is mentally retarded as that term is used in *Atkins.* His I.Q. scores are not within the typical cutoff range cited in *Atkins.* Williams does not point us to evidence showing limitations in adaptive skills. *Atkins* informs that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus" against executing. *Id.* at 317, 122 S.Ct. 2242.

The claim he presents is that he "has never been fully evaluated for mental retardation," and "[t]here is a very real chance" that he is mentally retarded. Petition, p. 18. Having considered the evidence, however, we conclude that Williams has not made a showing that he is mentally retarded within the proscription of *Atkins.* We note, too, that *Atkins* was decided more than a year ago, but Williams is only now presenting a possible claim under *Atkins.*

As already indicated, Williams has not presented anything that could be characterized as previously undiscovered evidence. Therefore, he has not presented any cognizable claim under Indiana Code § 35–50–2–9(k) (2003), the statute pursuant to which he filed this petition. To the extent this claim involves the consideration of anything outside the realm of previously undiscovered evidence, Williams has not established a reasonable possibility that he is entitled to post-conviction relief. *See* P–C. R. 1 § 12(b).

**7. The death sentence does not violate *Ring v. Arizona.***

In *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the United States Supreme Court overruled *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), to the extent *Walton* allowed the judge, not the jury, to find an aggravating circumstance that supported a death sentence. The Supreme Court decided that *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), applies to Arizona's death penalty scheme. *Apprendi* announced the rule that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348.

Although the parties present argument on whether *Ring,* which was decided after the death sentence in this case became final, applies retroactively, we need not decide that today because neither *Ring* nor *Apprendi* is implicated in this case under any view that the Court might find plausible.

Williams claims that there is no evidence that the jury found an aggravating circumstance beyond a reasonable doubt and no evidence that the jury decided the aggravating circumstances outweighed the mitigating circumstances as required by the death penalty statute. *See* I.C. § 35–50–2–9(e) (1986).

The record shows otherwise. In the guilt phase, the jury found Williams guilty of two felony murders. Three death-eligible aggravating circumstances were alleged: (1) the intentional killing of Mr.

Rease during a robbery; (2) the intentional killing of Mrs. Rease during a robbery; and (3) the multiple murders of Mr. and Mrs. Rease. The jury was instructed that it could recommend the death penalty only if it found:

1. that the State has proved beyond a reasonable doubt the existence of one of the aggravating circumstances alleged in the charging information against Darnell Williams, and

2. that any mitigating circumstances that exist for Darnell Williams are outweighed by the aggravating circumstances for Darnell Williams.

Trial Record, p. 110, 121. The jury unanimously recommended the death penalty. Trial Record, p. 178A.

The guilt phase verdict necessarily shows that the jury unanimously found that Williams had committed two murders, and thus, shows that the multiple-murder aggravating circumstance was proved beyond a reasonable doubt. *S ee Pope v. State,* 737 N.E.2d 374, 381 (Ind.2000) (jury's unanimous verdict in guilt phase, which found defendant guilty of multiple felony murders, constitutes a finding beyond a reasonable doubt of the existence of multiple murder aggravating circumstance; affirming sentence imposed under I.C. § 35–50–2–9). *Accord Rastafari v. State,* no. 45S00–0210–SD–510 (Ind. Feb. 5, 2003) (order denying permission to file a successive post-conviction petition on *Ring/Apprendi* grounds where petitioner had been convicted of multiple felony-murders); *Hough v. State,* no. 02S00–0211–SD–627 (Ind. Feb. 28, 2003) (same for prisoner convicted of multiple murders); *Wrinkles v. State,* 776 N.E.2d 905 (Ind. 2002) (same for prisoner convicted of multiple "knowing" murders).

In addition, we have previously held that *Ring* and *Apprendi* do not require specific verdict forms, and that when the jury receives an instruction like the one the jury received here, there is compliance with the mandate of *Ring* and *Apprendi. See Overstreet v. State,* 783 N.E.2d 1140, 1161 (Ind.2003).

Williams has not established a reasonable possibility that he is entitled to post-conviction relief on this claim. *See* P–C. R. 1 § 12(b).

## V. Conclusion

We have reviewed each of the claims raised by Williams beyond even the bounds within which he requested review. None of the these claims now being raised one week before the scheduled execution, after over sixteen years of litigation, present any reason to undermine confidence in a sentence recommended by the jury and affirmed at every level of review by federal and state courts. *See* Ind.Code § 35–50–2–9(k) (2003). Similarly, none of these claims establish a reasonable possibility that Williams is entitled to post-conviction relief. *See* P–C. R. 1 § 12.

We therefore deny the "Petition for the Consideration of New Evidence Pursuant to Indiana Code 35–50–2–9(k)."

Our rules allow Williams thirty days in which to petition for rehearing from this order. *See* App. R. 54(A)(4). However, by separate order, the date for execution of the sentence has been set for August 1, 2003, before the hour of sunrise, as specified by statute. *See Williams v. State,* case no. 45S00–9303–PD–397 (June 27, 2003 Order Setting Date for Execution of Death Sentence). Although we consider today's order final, should Williams wish to seek rehearing he may do so by filing a petition asserting any basis for reconsidering the claims decided today. If Williams elects to file such a petition, an original and five copies of the petition must be physically on file in the Clerk's office and

personally served on the Indiana Attorney General by noon on Monday, July 28, 2003. An original and five copies of any response by the Attorney General will then be due in the Clerk's office on or before noon on Tuesday, July 29, 2003. To minimize any delay in the service and receipt of papers, the attorneys are ordered to certify in papers presented for filing that copies have been sent by fax to the Supreme Court Administration office (fax number 317/232–8372), and by fax or electronic mail to the other party's attorney. The matter will then be fully briefed and the Court will take the petition under advisement.

The Clerk is directed to send a copy of this order to the Lake Superior Court; to the Public Defender of Indiana; to the Attorney General of Indiana; to Paula Sites, the Public Defender Council; to Rebecca McClure, the Prosecuting Attorneys' Council; and to counsel of record. The Court's administration office will fax courtesy copies of this order to counsel and the federal courts.

SHEPARD, C.J., and DICKSON and SULLIVAN, JJ., concur.

BOEHM, J., dissents with opinion.

RUCKER, J., dissents with opinion.

BOEHM, J., dissenting.

I concurred in the unanimous order of this Court entered June 27, 2003 denying Williams's June 9, 2003 "Motion for Forensic Testing" and his concurrent request for permission to file a successive petition for post-conviction relief. Williams now asks this Court to revisit essentially the same issues under new subsection (k) to Indiana's death penalty statute. Ind.Code § 35–50–2–9(k). P.L. 147–2003 effective July 1, 2003. It is an open question whether that statute creates any procedural route to review a sentence of death than is already afforded under Indiana's post-conviction rules. Regardless of the resolution of that issue, I would grant Williams's request for DNA testing and postpone his execution for sufficient time to permit that testing to be performed and, if it shows what Williams claims, for the results to be considered by the post-conviction court.

By all accounts, Williams and Gregory Rouster invaded the home of Mr. and Mrs. Rease and left the pair dead from multiple gunshots.[1] I agree with the majority that Williams's current motion presents no evidence that is undiscovered. However, DNA analysis of the blood found on Williams's shorts, if performed, would obviously be undiscovered. Indeed, it does not exist as of this day. Although undiscovered, this Court, in an Order dated June 27, 2003, unanimously concluded that this DNA evidence, even if it showed the blood not to be from Mrs. Rease, would not affect confidence in Williams's death penalty. That conclusion was based on a large body of evidence pointing to Williams as not merely Rouster's accomplice, but as the person who executed Mrs. Rease.

Williams's June 9, 2003 Motion made little reference to the interview of Elliott Streeter conducted by the prosecutor two days after these 1986 killings.[2] Our June

---

[1.] The evidence is recited in this Court's opinion affirming both Rouster's and Williams's convictions on direct appeal, *Rouster v. State,* 600 N.E.2d 1342 (Ind.1992), and affirming denial of post-conviction relief to Williams, *Williams v. State,* 706 N.E.2d 149 (Ind.1999).

[2.] Williams filed his Motion on June 9, 2003. He did not initially file a copy of the interview with his Motion, but supplied it on June 20 along with other exhibits to his federal habeas petition when the Court Administrator pointed out that the Motion referred to habeas exhibits that were not available to the court. His Motion noted that Streeter claimed that

27 Order disposed of Streeter's statement, correctly, by noting that in 1986 it was identified by the prosecutor to the defense before the trial. It therefore was not new or undiscovered evidence. Although Streeter's version is not new, it was not presented to the jury and in my view, it does, in concert with other evidence, establish a reasonable possibility that the blood evidence is indeed significant.

Streeter lived in the neighborhood and knew both Williams and his accomplice Rouster. He told the prosecution several things in his interview that are significant as to whether the jury would recommend the death penalty or the trial judge impose it. Streeter reported hearing the statement from Rouster to his girlfriend immediately following the killings that "I killed [the Reases] ... I killed them." This statement, describing Rouster shooting both victims, was cumulative of a report by another witness at trial who testified to exactly the same words from Rouster. Not all of Streeter's account was cumulative of other evidence, however. He also reported seeing Williams fire two shots at the Reases' furniture, then seeing Williams outside the house when seven more shots were fired from a different sounding gun. The jury did not hear any of this testimony because Streeter was never called at trial.

The blood on Williams's shorts was cited by the prosecution as establishing that Williams was in the room, and close to at least one of the victims, at the time the fatal shots were fired. This in turn was presented as supporting the death penalty for Williams, not just his liability as an accomplice to Rouster's murders or a participant in a felony murder. Based on the other evidence cited by the State and recited in our June 27 Order, we concluded

that the blood evidence was not critical to the conclusion that Williams was a direct participant in the killings. The most important evidence placing Williams at the scene of the killings was the testimony of Derrick Bryant, who testified that he hid in the house and heard Williams tell Mrs. Rease "It's your time" immediately before gunshots were fired. I agree that Streeter's testimony is itself procedurally defaulted because Williams did not call Streeter as a witness in 1986. I also agree that Bryant's mental health history was presumably inadmissible. The trial court so ruled and there was no appeal of that issue. However, when Streeter's account is matched up with admitted animosity between Williams and Bryant, I believe it underscores and bolsters Williams's claim that there is a genuine issue as to Williams's direct participation as an executioner of this couple. Evidence that Williams had the victims' blood on his clothing would be powerful in tipping this balance. At the time of trial the best science could offer was to confirm that the blood sample was consistent with that of the victims and of 41% of the population at large. We now have the technology with the potential to establish beyond any reasonable doubt that the blood was or was not from the victims.

This is a death penalty case, and Williams seems to me to have presented a plausible claim that DNA testing would present a reasonable possibility of affecting the decision of a jury to recommend the death penalty. For that reason, and that reason alone, I would permit the test to go forward. The public's confidence in the imposition of the death penalty in every case is extremely important. Although I join the majority in viewing the

Williams was outside the house at the time fatal shots were fired, but did not elaborate

the significance of the point.

likely outcome of the exercise with considerable skepticism, I would nevertheless permit the process to unfold. If the test confirms Williams's presence at the scene, the cost to the public in either expense or delay seems minimal in relation to the benefit of confidence in the verdict. And if Williams is correct that the blood was not from one of the victims, I would find the death penalty sufficiently unreliable that it should be set aside and a new penalty phase ordered.

On all other issues I agree with the majority that Williams has not presented a persuasive claim. Specifically, I would not permit his effort to attack the jury's 1986 recommendation based on the 2003 views of individual jurors as expressed in affidavits he solicited from them. Williams seeks to bolster his contention that the blood evidence is significant with affidavits from jurors that they considered the blood evidence important in assessing the death penalty. Indiana Rule of Evidence 606(b), like its federal evidence counterpart, and like the rules of evidence, common law, or statutes in virtually every state, does not allow individual jurors to offer their accounts of the jury's reasoning to upset the collective finding. *See, e.g., McDonald v. Pless,* 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915)(common law); *Shillcutt v. Gagnon,* 827 F.2d 1155 (7th Cir.1987)(Federal Rule of Evidence 606(b)); *Ward v. St. Mary Medical Center of Gary,* 658 N.E.2d 893 (Ind.1995) (Indiana law pre Rules of Evidence). This rule, which was long followed at common law before the Rules of Evidence were adopted in Indiana and elsewhere, is grounded in very sound reasons. Jurors should not be subjected to post-lawsuit one-on-one arguments for re-hearing by unsuccessful litigants. Both the jurors' privacy and the interests of justice require that once the jury has delivered its collective verdict, no individual juror can contradict it. Unilateral entreat-ies from the losing party will be less than balanced, and are likely to produce a skewed view. This is particularly a concern in efforts to revisit cases long after the trial. Moreover, jury duty is a critical civic responsibility, but once jury duty is complete, jurors should be permitted to resume their lives unbothered by disgruntled litigants. For all these reasons, I would not accept the juror's affidavits, however well intentioned they may be. To accept them in this case is to invite losing parties to hound future jurors in thousands of others. Accordingly, I agree that the jurors' affidavits should not be considered. I base my dissent solely on my view that the issues Williams presents collectively raise a reasonable objective possibility that DNA evidence could affect a reasonable jury's recommendation of the death penalty.

Finally, I join the majority in expressing frustration at the manner in which this issue is raised. The potential significance of DNA testing has been an issue in this case for at least two years. At the time of the 1997 appeal to this Court from the denial of post-conviction relief, Williams says he concluded that the then current state of technology did not permit DNA analysis that would resolve this issue. In April, 2001, however, Williams sought a federal court order for DNA testing. He did not present the issue to this Court until June 9, 2003, after the Seventh Circuit had denied an appeal from the denial of habeas and after the State had moved to schedule execution. Williams presented his claims of Bryant's instability and more than cursory reference to the Streeter interview for the first time in his July 18, 2003 "Petition for Consideration of New Evidence". That timing certainly lends credence to the State's claim that there is little merit to Williams's contentions and

his objective in playing one card at a time is delay, not justice.

RUCKER, J., dissenting.

Like Justice Boehm, I too concurred in this Court's June 27, 2003 order denying Williams' June 9, 2003 "Motion for Forensic Testing" and his request for permission to file a successive petition for post-conviction relief. On re-evaluation, I would now grant the motion. Should forensic testing reveal that the blood on Williams' clothing is not that of the victims, I would remand this cause for a new penalty phase trial and sentencing hearing. Thus, I concur in part with Justice Boehm's separate dissenting opinion.

Throughout these proceedings Williams essentially has made two claims: (1) he did not shoot the Reases, and (2) in fact he was not present in the house when the shooting occurred. The law is settled that one need not be the actual killer in order to qualify for the death penalty. *See Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (holding that major participation in the felony combined with reckless indifference to human life is sufficient to demonstrate the culpability required under the Eighth Amendment for capital punishment); *Ajabu v. State*, 693 N.E.2d 921, 937 (Ind.1998) ("A person who substantially participates but does not deliver the fatal blow may still fall within the [Indiana Capital Punishment] statute's scope."). The evidence in this case overwhelmingly shows that Williams' participation in the killing and robbery of John and Henrietta Rease was major and his conduct displayed a reckless indifference to their lives. Therefore it is clear that Williams qualifies for the death penalty.

The question remains, however, whether the jury would have recommended and the trial court imposed the ultimate sanction if: (1) either had been informed that Elliot Streeter unequivocally placed Williams outside of the Reases' home when the apparent fatal shots were fired, and (2) DNA evidence had been introduced showing that the blood on Williams' clothing was not that of the Reases.

To be sure, the Streeter testimony would only have contradicted the testimony of other witnesses. And of course the jury may have totally disregarded his testimony. As for the evidence of blood on Williams' clothing, even the total absence of such evidence does not mean that Williams was neither present nor the triggerman. Still, we do not know and cannot be sure what weight a penalty phase jury may have placed on such evidence or what conclusion a sentencing court judge may have reached in light of such evidence. The record is clear that at trial both the State and the defense put a great deal of credence on what has been characterized as the "blood evidence." And in sentencing Williams to death, the trial court considered that evidence "significant."

Death is different. In my view, confidence in the judicial system and in the administration of justice dictates that Williams' request for forensic testing should be granted and his execution be postponed. Should the testing reveal that the blood on Williams' clothing belongs neither to Mr. Rease nor to Mrs. Rease, I would remand this cause for a new penalty phase trial and sentencing hearing. *See Rondon v. State*, 711 N.E.2d 506, 523 (Ind. 1999).