# In the
# Indiana Supreme Court

David Leon WOODS,                    )          Supreme Court Cause No.
      Petitioner,                    )          06S00-0612-SD-544
    v.                                )
                                     )          Boone Superior Court
STATE of Indiana,                    )          S 7007
      Respondent.                    )

## PUBLISHED ORDER CONCERNING SUCCESSIVE PETITION
## FOR POST-CONVICTION RELIEF IN CAPITAL CASE

### Introduction

Having exhausted the judicial review to which he is entitled as a matter of right, David Leon Woods remains sentenced to death for the intentional killing of an elderly DeKalb County man during a robbery. Before us now is Woods's request to litigate a second, or "successive" post-conviction proceeding involving two claims: (1) that he is exempt from the death penalty because he is mentally retarded, and (2) that his first state post-conviction proceeding was unfair because he had a dispute with his attorneys about strategy. Because we conclude Woods has not met the threshold showing required on either claim, we deny authorization for any further successive post-conviction proceedings. A date for execution of the sentence will be set by separate order.

### Background

On April 7, 1984, in Garrett, Indiana, Woods, along with Greg Sloan and Pat Sweet, devised a plan to steal Juan Placencia's television. Placencia, age 77, was an acquaintance of Woods and his mother. Woods, Sloan and Sweet went to Placencia's home. Woods was armed with a knife, but assured Sloan and Sweet that he intended only to scare Placencia with it. While Sweet stayed in the yard, Woods and Sloan approached the apartment and rang the doorbell. When Placencia opened the door, Woods immediately jumped in and stabbed him several times with the knife. Placencia fell back into a chair, directed the intruders to his money, and began asking for help. Woods took $130 from Placencia's wallet, then stabbed Placencia again repeatedly—twenty-one times to the face, neck, and torso. An autopsy showed Placencia died from three stabs wounds to the heart and one through the skull to the brain. Woods and Sloan left Placencia's apartment with the cash Woods had taken and a television they later sold for $20. They also washed their clothes and threw the knife and other incriminating items in a creek.

Woods was charged with murder and robbery. *See* Ind. Code § 35-42-1-1(1) (murder); § 35-42-5-1 (robbery). The State sought the death penalty, alleging one aggravating circumstance that rendered Woods eligible for a death sentence: Woods had committed "an intentional murder in the commission of a robbery." Ind. Code § 35-50-2-9(b)(1). Venue was transferred from DeKalb County to Boone County, and the case was tried in the Boone Superior

Court.

The jury found Woods guilty as charged and in the penalty phase that followed, the jury unanimously recommended the death sentence. *See* I.C. § 35-50-2-9(e) (providing that a jury may recommend the death penalty only if it finds the state has proved an aggravating circumstance beyond a reasonable doubt and that any mitigating circumstances are outweighed by the aggravating circumstances). The Boone Superior Court followed the jury's recommendation and sentenced Woods to death.

Courts have affirmed the convictions and death sentence at each stage of subsequent review. We affirmed the death sentence on direct appeal in Woods v. State, 547 N.E.2d 772 (Ind. 1989) (addressing arguments relating to Woods's mental competence to stand trial, sufficiency of the evidence, the prosecutor's conduct, fairness of the trial, and appropriateness of the death sentence), *reh'g granted*, 557 N.E.2d 1325 (Ind. 1990) (addressing, but rejecting, an argument concerning admission of victim impact evidence), *cert. denied*, 501 U.S. 1259 (1991). Woods sought collateral relief in a state trial court, but that court denied his post-conviction petition and we affirmed in Woods v. State, 701 N.E.2d 1208 (Ind. 1998) (addressing arguments relating to the effective assistance of counsel), *reh'g denied* (1999), *cert. denied*, 528 U.S. 861 (1999). Woods then sought relief in federal courts. The United States District Court for the Southern District of Indiana denied Woods's petition for a writ of habeas corpus in Woods v. Anderson, 302 F. Supp.2d 915 (S.D. Ind. 2004). The United States Court of Appeals for the Seventh Circuit affirmed in Woods v. McBride, 430 F.3d 813 (2005), *reh'g and reh'g en banc denied* (2006), *cert. denied*, 127 S. Ct. 391 (2006).

Woods has thus received the review of the convictions and death sentence to which he is entitled as a matter of right. We have jurisdiction in this post-conviction proceeding because he is sentenced to death. *See* Ind. Appellate Rule 4(A)(1)(a).

### Indiana's Successive Post-Conviction Procedures

Before us now is Woods's request to litigate additional post-conviction claims. As indicated, Woods has already availed himself of our rule that provides a person convicted of a crime in an Indiana state court one collateral review of a conviction and sentence in a post-conviction proceeding. *See* Ind. Post-Conviction Rule 1. Because he has completed the review to which he is entitled as a matter of right, he needs our permission to litigate another or "successive" post-conviction claim. We permit such a proceeding to go forward only "if the petitioner establishes a reasonable possibility that the petitioner is entitled to post-conviction relief." P-C.R. 1 § 12(b). In deciding whether Woods has made the required showing, we consider the applicable law, the successive post-conviction papers,[1] materials from his prior

---

[1]Woods tendered a "[Successive] Petition for Post-Conviction Relief," and filed a "Successive Post-Conviction Relief Rule 1 Petition" and a "Petition and Memorandum in Support of Motion for Leave to File Successive Petition for Post-Conviction Relief and Motion for Funds." The State then filed the "State's Verified Consolidated Response in Opposition to Motion for Leave to File Successive Petition for Post-Conviction Relief and Motion for Funds." Woods was allowed to file "Petitioner's Response to State's Verified Consolidated Response in Opposition to Motion for Leave to File Successor Petition for Post Conviction Relief," and the State was allowed to file the "State's Verified Surreply to Petitioner's Response."

appeals and post-conviction proceedings, including the record, briefs and court decisions, and any other material we deem relevant. *See id.* If we authorize the proceeding to go forward, Woods would be entitled to counsel at public expense and the case would return to the trial court for further proceedings in accordance with Post-Conviction Rule 1. *See id*. § 12(c).

**The Claims**

**1. Woods has not shown a reasonable possibility that he is mentally retarded.** Woods claims (a) he is exempt from execution under the state and federal constitutions[2] because he is mentally retarded as discussed in Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002), and interpreted by this Court in Pruitt v. State, 834 N.E.2d 90, 103-110 (Ind. 2005); or (b) he at least should be allowed to hire experts and litigate whether he is mentally retarded.

In Atkins, the United States Supreme Court declared that mentally retarded persons are regarded as less culpable because of their diminished mental capacities, identified a "national consensus" against executing mentally retarded persons, and held that execution of mentally retarded persons is an "excessive sanction" that violates the Eighth Amendment to the United States Constitution. The descriptions of mental retardation cited in Atkins have two components; the person must have: (1) significantly subaverage intellectual functioning, *and* (2) limitations in adaptive skills, both manifesting before the person reaches age eighteen. 536 U.S. at 308 n.3; 122 S. Ct. at 2249 (citing descriptions of mental retardation from the American Association of Mental Retardation and the American Psychiatric Association). Under these descriptions, a person is considered to meet the subaverage intellectual functioning component if the person's full-scale IQ test score is two standard deviations below the mean; i.e., an IQ between 70 and 75 or lower. 536 U.S. at 309 n.5, 122 S. Ct. at 2245; *accord* Williams v. State, 793 N.E.2d 1019, 1028 (Ind. 2003).

Indiana enacted legislation prohibiting execution of mentally retarded persons before Atkins was decided.[3] Our statute provides that a "mentally retarded individual" is an individual

---

[2] Woods cites two provisions of the U.S. Constitution: the Eighth Amendment (prohibiting cruel and unusual punishment); and the Fourteenth Amendment (guaranteeing equal protection and due process to citizens). He cites several sections in Article I of Indiana's Constitution: Section 13 (specifying, in part, that "the accused shall have the right to a public trial, by an impartial jury, in the county in which the offense shall have been committed; to be heard by himself and counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor"); Section 16 (specifying that "[c]ruel and unusual punishments shall not be inflicted" and that "[a]ll penalties shall be proportioned to the nature of the offense"); and Section 18 (specifying that the "penal code shall be founded on the principles of reformation, and not of vindictive justice").

[3] *See* Ind. Code §§ 35-36-9-1 through 7. Under Indiana's statutory scheme, whether a person is mentally retarded is to be decided before trial, but the legislation was enacted after Woods's trial. Our legislature specified this law applies to capital cases tried after June 1994. *See* Pub. L. 158-1994 § 8, 1994 Ind. Acts 1849, 1857. Woods was tried ten years earlier in 1984. Although we have followed the legislature's specific mandate of repose and have not applied the legislation to death sentences imposed before its effective date, we have nonetheless applied the Atkins proscription against execution of mentally retarded persons to death-sentenced inmates who have raised the claim. *See, e.g.,* Williams, 793 N.E.2d at 1027-28 (denying inmate permission to litigate in successive post-conviction proceedings issue of whether he was mentally retarded pursuant to Atkins); Rastafari v. State, No. 45S00-0210-SD-510 (Ind. Feb. 5, 2003) (unpublished order allowing inmate to litigate the issue).

3

who, before age 22, "manifests (1) significantly subaverage intellectual functioning; and (2) substantial impairment of adaptive behavior . . . documented in a court ordered evaluative report." Ind. Code § 35-36-9-2. Although not identical to either description cited in Atkins, Indiana's statute similarly requires proof that the person meets both the intellectual and behavior components. We have said that IQ tests are not conclusive on the question of whether an individual meets the subaverage intellectual functioning component, and that courts may consider IQ scores together with other evidence of the person's mental capacity. Pruitt, 834 N.E.2d at 106. Nonetheless, IQ scores may be such that they show the person does not meet the intellectual component of mental retardation. *See, e.g.,* Williams, 793 N.E.2d at 1028.

Woods has been the subject of a substantial amount of examination and testing; the record already contains extensive documentation about his mental status. Woods was evaluated several times by educational and mental health professionals before he committed the murder. (*See, e.g.*, PC Record, Def's Exh. E, a separate volume of the record summarizing much of this information.) He has retained at least three mental health experts to examine him at trial (Neil Shamberg, Ph.D) and in his first state post-conviction proceeding (Jeffrey Smalldon, Ph.D, and Linda Wetzel, Ph.D). At least three other psychological reports in the record address Woods's intellectual functioning. Most recently, Woods submitted a letter from Dr. Denis Keyes, Ph.D. ([Successive] Post-Conv. Pet., unlabeled attachment, letter dated December 26, 2006.) Despite considerable resources already having been spent to investigate Woods's mental status, Woods is not identified as mentally retarded in any of these sources or by his own experts.

Having reviewed the documentation cited by the parties, we conclude the record does not establish a reasonable possibility that Woods's intellectual functioning puts him in the class of persons who are considered mentally retarded. Woods was born in 1964. In April 1977, at age 12, Woods's IQ was scored as 84 based on results of the California Test of Mental Maturity (CTMM). (PC Record p. 1272, Def's Exh. K, records of Garrett Junior High School.) In 1980, as part of a full diagnostic evaluation at the Department of Correction Youth Authority, Woods scored a full-scale IQ of 84 on the Wechsler Intelligence Scale for Children-Revised (WISC-R) (PC Record p. 1408-09, evaluation by Betty Jean Valdez, M.A., behavioral clinician, and Ivan Pangrac, Ph.D, clinical psychologist.) This report showed Woods's subset nonverbal IQ score in the low average range and his verbal IQ in the range of borderline mentally retarded, but his intellectual functioning with reference to the full-scale score was described as "in the very low average range." (*Id.* p. 1409.) This report recommended remedial education, but did not suggest special education or other services for mentally retarded children. In 1979, an evaluator at the Northeastern Center observed that Woods appeared to be "within the normal range intellectually," although no testing was performed. (PC Record p. 1469, report of Bonita Sheldon, M.S.)

Other testing occurred when Woods was an adult. He scored a full-scale IQ of 93 in 1984 on a Wechsler Adult Intelligence Scale (WAIS) test performed by his trial defense expert. (PC Record p. 1481-82, Psychological Evaluation by Neil Shamberg Ph.D.) Dr. Shamberg found the subtest scores to have an unusual pattern suggestive of minimal brain damage, dyslexia, or other learning disorder, but neither his report nor his testimony mentions mental retardation. In 1994 and 1995, when he was in his thirties, Woods was extensively evaluated in connection with his first state post-conviction proceedings by Linda Wetzel, Ph.D. and Jeffrey Smalldon, Ph.D. (PC Record p. 2095-2138, Psychological Evaluation report by Dr. Smalldon.)

4

Woods scored a full scale IQ of 86 on the Wechsler Adult Intelligence Scale-Revised Test administered by Dr. Wetzel in 1994. (PC Record p. 2129.) Dr. Smalldon noted the unusual pattern of test scores and attributed that result to possible functional brain impairment, but he did not suggest that Woods was mentally retarded. Even if, as Woods argues, these results should be discounted because Woods was older or because better tests were available, the fact remains that despite all this testing and the many examinations and consultations over the years, none of these professionals diagnosed him as mentally retarded.

The information most favorable to Woods shows that in 1980 and 1981, he was evaluated by a staff psychologist in connection with being placed in a group home. (PC Record p. 1293-98, Def's Exh. M, reports of Dr. Richard D. Kahoe, Ph.D.) The psychologist administered a "Quick Test" on which Woods scored a "vocabulary mental age" equivalent to an IQ of 73. (*Id.* p. 1297.) The psychologist also administered portions of the Peabody Individual Achievement Tests; Woods scored higher than expected on the math portion and lower on language portions. (*Id.* p. 1296.) Woods also points to a Wide Range of Achievement Test (WRAT), administered in 1984 when he was 20, which showed his performance in reading, spelling and arithmetic was performed at or below the sixth grade level. (PC Record p. 1482, record of Northeastern Center, Psychological Evaluation by Neil Shamberg, Ph.D.) Woods cites these scores, then notes that persons with mild mental retardation are generally considered "educable" up to a sixth grade level. (Pet's Resp. p. 4, citing *Diagnostic and Statistical Manual of Mental Disorders, Text Revision*, 43 (4th ed. 2000).) From this, Woods apparently would have us conclude that he is, therefore, mentally retarded. As the State points out, however, these were not full-scale IQ scores, which is required in both descriptions cited in Atkins. Even if IQ scores are not necessary or are not conclusive under Indiana's statute, the fact remains that none of the mental health professionals, despite the extensive testing and evaluation, have concluded Woods is mentally retarded.

Woods did poorly in school and he did not graduate from high school. His lowest full-scale IQ score was 84; his highest was 93. He scored 73 on two partial tests. But none of the experts have said Woods is mentally retarded. Denis Keyes, Ph.D., who considered Woods's case most recently, noted the "clear evidence of brain damage," but he did not conclude that Woods meets the intellectual functioning component of the mental retardation descriptions. The most Dr. Keyes was willing to say was that Woods "needs to be fully evaluated." Having considered the evidence, however, we conclude that Woods has not shown a reasonable possibility that he meets the intellectual functioning component of mental retardation. In light of this, we need not address Woods's argument relating to the adaptive behavior component.

**2. Woods's claim that he had a "conflict of interest" with the attorneys who represented him in the state post-conviction proceedings is raised too late, and in any event, other courts have concluded that he received a fair post-conviction hearing.** Attorneys on contract with the state public defender were appointed to represent Woods in his first post-conviction proceeding according to our rules. *See* P-C. R. 1, § 9; Ind. Criminal Rule 24(H) (providing for counsel at public expense in post-conviction proceedings). Three weeks before the hearing on the merits of Woods's first post-conviction petition, Woods filed, *pro se*, a "Motion for Change of Counsel," stating that he disagreed with the manner in which the attorneys were handling his case and asking the post-conviction court to appoint new attorneys. (PC Record p. 277-85.) His attorneys also filed a "Motion to Withdraw as Counsel," stating that

the differences with Woods "raised concerns that counsel [would] be unable to provide effective assistance of counsel." (PC Record p. 281-83.) The post-conviction court, concluding that "[n]either motion contains any facts which justify change or withdrawal of counsel," denied both motions. (PC Record p. 284-85.) The case proceeded to a hearing on the merits of the post-conviction petition which, as previously indicated, was denied by the post-conviction court and affirmed by this Court on appeal. Woods did not raise the trial court's denial of his motion for new attorneys as an issue in the post-conviction appeal.

This disagreement with his attorneys about strategy is what Woods now labels a "conflict of interest," and he asserts the post-conviction court's denial of his motion for new attorneys left him in the "untenable position" of choosing between being represented by attorneys with whose strategy he disagreed or having to represent himself. Woods claims he "has never had the opportunity to fully address this claim" and as a result, he has been denied a "fundamentally fair and adequate" post-conviction proceeding in violation of the state and federal constitutions.[4]

Even assuming Woods had some cognizable claim that the post-conviction court erred in denying him new attorneys mere weeks before the scheduled post-conviction hearing, that argument could have been raised in the appeal from the denial of post-conviction relief, but was not. *See* Woods v. State, 701 N.E.2d 1208. Woods concedes he knew about the issue but did not raise it. (Mem. in Support p. 6.) Our case law is clearly established that an issue known and available but not raised in an earlier proceeding, is procedurally defaulted as a basis for relief in subsequent proceedings. *See, e.g.,* Matheney v. State, 834 N.E.2d 658, 662 (Ind. 2005); Daniels v. State, 741 N.E.2d 1177, 1184-87 (Ind. 2001). Woods's claim is procedurally defaulted, and he is not entitled to have us decide his claim now.

In any event, Woods has already litigated this issue in two federal courts, and he lost. In the federal habeas proceeding, Woods argued the State should have provided him "with the opportunity to air his concerns about the 'conflict,' and the denial of that opportunity was a violation of due process." Woods v. McBride, 430 F.3d at 827. The district court found "no basis for concluding that either the trial court's ruling denying the motion to withdraw filed by counsel for Woods in August 1995 or the existence, manner, or type of review afforded on this subject by the Indiana Supreme Court denied Woods representation in the post-conviction action in a manner violative of due process." Woods v. Anderson, 302 F. Supp.2d at 944. The Seventh Circuit affirmed, agreeing with the district court that there was no basis for concluding that Woods had been deprived of any constitutional right:

> [W]e agree with the state's argument that, in certain respects, what Woods has characterized as a "conflict" with his counsel is really nothing more than an attempt to advance an ineffective assistance of PCR counsel claim while sidestepping procedural default. Viewed in that light, there was certainly nothing unreasonable about PCR counsel's decision to push forward with a powerful mitigation strategy at the PCR hearing and to elicit mitigation testimony from Woods himself (who, at trial counsel's suggestion, chose not to take the stand in

---

[4] Woods cites the same constitutional provisions: the Eighth and Fourteenth Amendments to the federal constitution and Article 1, Sections 13, 16 and 18 of Indiana's constitution.

6

the penalty phase).  Central to the post-conviction litigation strategy was the effort to frame and support the argument that trial counsel was constitutionally defective, and as discussed at length above, a cornerstone of that strategy was to elicit additional details at the PCR hearing that would suggest that trial counsel was not up to snuff during the penalty phase.  We have already disposed of that line of argument, but it is equally clear to us that PCR counsel's strategy was a sound one.   PCR counsel did, after all, turn up additional mitigation details— albeit details insufficient to indicate that trial counsel was constitutionally ineffective in not eliciting those details the first time around.

* * * *

As far as Woods's suggestion of an "actual conflict of interest," we find at most a disagreement between Woods and his PCR counsel as to strategy.  We have found that personality conflicts and disagreements over trial strategy of this sort do not constitute reversible error.  Likewise, to the extent Woods may be suggesting it, we find nothing to indicate that the strategic disagreement hampered his ability to assist PCR counsel at the hearing.  It follows that there was not an actual conflict of interest in Woods's case such that the Indiana courts were required to put off post-conviction review in order to hear Woods's claims or risk running afoul of the Constitution.   Woods's disagreement with his PCR counsel over post-conviction strategy simply does not rise to that level, particularly in light of the eminently reasonable mitigation strategy undertaken by his PCR counsel.

Woods v. McBride, 430 F.3d at 827-28 (citations omitted).   We agree with this analysis of the federal courts.

## Conclusion

Because Woods has not met his burden of establishing a reasonable possibility that he is entitled to post-conviction relief on either of the claims he presents, we decline to authorize the filing of a successive petition.  A date for execution of the death sentence will be set by separate order.

The Clerk is directed to send a copy of this order to counsel of record and to West Group for publication in the bound volumes of this Court's decisions.

Done at Indianapolis, Indiana, this 26 day of March, 2007.

/s/      Randall T. Shepard
Chief Justice of Indiana

Shepard, C.J., and Dickson, Sullivan, Boehm, and Rucker, JJ., concur.

7